Ulus JORDEN, Jr., Appellant,

v.

NATIONAL GUARD BUREAU, Departments of the Army and the Air Force; Emmett H. Walker, Jr., Chief, National Guard Bureau; Richard M. Scott, Major General (PA), The Adjutant General, Commonwealth of Pennsylvania; John D. Campbell, individually and as Colonel, Pennsylvania Air National Guard Base Detachment Commander; and Henry C. Frisby, individually and as Major, Pennsylvania Air National Guard Chief, Administration, Appellees.

No. 85–1664.

United States Court of Appeals, Third Circuit.

Argued June 3, 1986.

Decided Aug. 27, 1986.

Rehearing and Rehearing In Banc Denied Oct. 23, 1986.

Frank Finch, III (Argued), McDaniel, Dade, Wheeler & Walwyn, Philadelphia, Pa., for appellant.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, Margaret L. Hutchinson, Asst. U.S. Atty., Philadelphia, Pa., Thomas M. Crowley (Argued), Office of the Attorney General, Harrisburg, Pa., Marilyn D. Barton, Major, USAF (Argued), Office of the Judge Advocate General, U.S. Air Force, Washington, D.C., for appellees.

Before GIBBONS, BECKER, and STAPLETON, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This case requires us to determine the susceptibility of National Guard officers to suits by guardsmen for damages and injunctive relief. Plaintiff, Ulus Jorden, discharged from both his military and civilian positions in the Pennsylvania Air National Guard ("PaANG"), sought damages against his superiors and reinstatement to both positions. Relying on *Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), the district court dismissed plaintiff's case under Fed.R.Civ.P. 12(B).

Although we find that the district court acted correctly in dismissing Jorden's claims for damages, we conclude that it erred in dismissing his claims for injunctive relief, *i.e.*, reinstatement, accordingly, we shall affirm in part and reverse in part and remand this case for further proceedings.

Part I of this opinion sets forth the necessary background—the structure of the National Guard and the facts and procedural history of this case. Part II begins with a brief history of the case law concerning the immunity of military officers from damages claims, and then applies that body of law to the instant case. Similarly, Part III begins with a brief history of the case law concerning the reviewability of claims for injunctive relief against the military, and then considers its applicability to Jorden's claims for reinstatement.[1]

---

1. It is useful at the outset to distinguish among several terms that arise in cases involving the military. First, courts usually invoke the term "immunity" to refer only to whether particular defendants are susceptible to or are free from *damages* actions, while using "reviewability" to refer more generally to the appropriateness of a civilian court hearing cases that involve military matters. *See Wallace v. Chappell*, 661 F.2d 729, 734 (9th Cir.1981), *rev'd on other grounds*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). We shall follow this path (notwithstanding the fact that the term "immunity" could be understood more broadly to apply to claims for both

## I. Background

### A. Structure of the National Guard

As this court noted recently in *Johnson v. Orr*, 780 F.2d 386, 388 (3d Cir.1986), the National Guard has an "unusual 'hybrid' status as an agency with both federal and state characteristics." The Guard is the modern successor to the state militia, *see Engblom v. Carey*, 522 F.Supp. 57, 65 (S.D. N.Y.1981), and all fifty states and Puerto Rico have their own Guard. Article 1, Section 8, clause 16 of the Constitution places the power of appointing personnel to the state militia in the hands of the state. Guard members are called out for roughly two weeks a year of military training. In addition, governors may call out their state Guard at any time for state emergencies such as riots and floods. However, there is a federal component to the Guard as well. The National Guard Bureau, an adjunct of the United States Departments of the Army and Air Force, gives Guard personnel federal recognition as part of either the Army National Guard of the United States or the Air National Guard of the United States ("ANGUS"). In addition, the President may call the Guard into national service, 10 U.S.C. § 3495 (1982).

The Guard's status is further complicated by its having a mixture of military and civilian elements. In addition to its military complement, the Guard hires full-time civilian technicians. The technician program provides various services critical to the Guard's mission: maintenance of equipment and facilities, support of aircraft operations, and clerical functions. The technician program too involves federal and state elements. Although the 1968 National Guard Technicians Act, 32 U.S.C. § 709 (1982), made civilian technicians federal employees, the technician program is administered at the state level.[2] The adjutant general, a state officer, is in charge of personnel matters. Finally, and significant in this case, in order to be eligible for a technician position, one must be a Guard military member. 32 U.S.C. § 709(b). A Guard technician is automatically dismissed from his civilian technician position if he loses his military membership, 32 U.S.C. § 709(e)(6), and can otherwise be dismissed "for cause." 32 U.S.C. § 709(e)(3).

### B. Facts And Procedural History

In 1956 plaintiff-appellant Jorden became the first black member to enlist in PaANG. Two years later he became a full-time civilian technician in PaANG as well. For the next twenty-five years he served in both capacities without incident. Beginning in 1981, however, Jorden became either a "whistleblower" or a "troublemaker," depending on whom one believes. He launched a series of protests alleging various abuses by his superiors, including impermissible expenditure of Guard funds and discriminatory treatment of him personally.

Jorden alleges that his complaints were legitimate, that they were not followed up adequately, and that instead they led to a campaign of harassment against him. In October, 1984, he was called alone (without his unit), in an Order of the Governor, to

damages and injunctive relief). Thus, in Part Two, which concerns Jorden's damages claims, we use the term "immunity," while in part three, which concerns his claims for reinstatement, we use "reviewability." In addition, in the context of claims against the military, "justiciability," is sometimes used interchangeably with "reviewability" to denote generally the propriety of a court's hearing a particular claim. *Dillard v. Brown*, 652 F.2d 316, 322 n. 4 (3d Cir.1981). Because "justiciability" has a more specific meaning in other contexts, we use "reviewability." As the foregoing suggests, the nomenclature in this area is flexible, and while our choice of terms may seem arbitrary, it is designed to minimize confusion.

**2.** Thus, in *Johnson v. Orr*, 780 F.2d 386 (3d Cir.1986), we held that the New Jersey Adjutant General and technician supervisory personnel acted under the color of state law for the purpose of 42 U.S.C. § 1983 in dismissing Guard technicians. That case involved a certified question concerning the "color of state law" issue. Although *amici* contended that defendants were immune from a damages suit by virtue of their military status, we declined to reach that issue because it was not part of the question certified by the district court. *Id.* at 389 n. 6. The district court had held that, because the case arose almost entirely in a civilian context, the doctrine of military immunity was inapplicable.

active duty for twenty-three days of "special training." The order specified that, during the twenty-three day period, Jorden was to report to the Malcolm Grow Medical Center for psychiatric evaluation.

Jorden refused to comply, believing that the governor was not empowered to call out a single guardsman for such a special session. Following Jorden's non-compliance, PaANG Adjutant General Richard M. Scott dismissed him from his military position in PaANG. Thereupon, Jorden's technician employment was automatically terminated, because, as we have noted, only military members of the Guard are eligible for technician employment. At the time of his discharge, Jorden was a master sergeant in the PaANG military unit and an assistant office manager in the technician program.

Jorden then brought a civil rights suit in the United States District Court for the Eastern District of Pennsylvania alleging that his various superiors had engaged in a conspiracy to harass him and to discharge him on the basis of race and in retaliation for the exercise of his first amendment rights. Specifically, he asserted claims for damages under 42 U.S.C. §§ 1983, 1985 and 1986 against General Scott, Colonel John D. Campbell and Major Henry C. Frisby, all of whom were both his military officers and his civilian supervisors; a pendent state common law claim of defamation against Scott, Campbell and Frisby; and claims for reinstatement against the aforementioned defendants, as well as against Emmett Walker, Chief of the National Guard Bureau ("NGB") and against the NGB itself.[3]

■ Defendants moved for dismissal of plaintiff's entire case, invoking both Fed.R. Civ.P. 12(b)(1) and (6). As we have noted, the district court granted the motion to dismiss,[4] finding that Jorden's federal claims were barred by *Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), and then dismissing the state common law claim because pendent jurisdiction was lacking.[5]

---

3. Because Jorden asserted no proper jurisdictional basis for a suit against the NGB, the NGB was properly dismissed as a defendant. The NGB is an agency of the United States and is thus protected from lawsuits unless there has been a waiver of sovereign immunity. The Administrative Procedure Act ("APA"), 5 U.S.C. § 702 *et seq.* (1982), constitutes such a waiver, but Jorden does not make an APA challenge to actions of the NGB, whose only official action, the withdrawal of recognition of Jorden in ANGUS, was ministerial. Jorden does not dispute that, once he was removed from PaANG, he automatically lost his status in ANGUS. Rather, he intimated to the district court that certain currently unknown employees of the NGB (in addition to Walker) were aware of the conspiracy against him and acquiesced in it in violation of 42 U.S.C. § 1986. However, while such individuals may be sued, the NGB is not a "person" within § 1986. Nor is it necessary to include the NGB as a defendant to enable the implementation of a court order of injunctive relief. State defendants can reinstate Jorden to PaANG, and defendant Walker, Chief of the NGB, can reinstate Jorden to ANGUS.

4. The district court's opinion did not distinguish 12(b)(1) and (6), and its order did not specify whether the dismissal was pursuant to (1) or (6).

5. In a conclusory footnote, the court held that Jorden's failure to exhaust administrative remedies was an additional basis for dismissal. We disagree. It is true that Jorden has recourse to the Air Force Board for the Corrections of Military Records ("AFBCMR") under 10 U.S.C. § 1552. (Jorden has petitioned for relief under § 1552 and the petition is pending.) Some courts have dismissed actions because plaintiffs had not availed themselves of this remedy, *see, e.g., Sanders v. McCrady*, 537 F.2d 1199 (4th Cir.1976). However, this court has not adopted a *per se* exhaustion requirement for military personnel. Indeed, in *Nelson v. Miller*, 373 F.2d 474, 479–80 (3d Cir), *cert. denied*, 387 U.S. 924, 87 S.Ct. 2042, 18 L.Ed.2d 980 (1967), we explicitly rejected a rule that would require recourse to 10 U.S.C. § 1552 before military personnel could bring a claim. Rather, we said, exhaustion depends on the potential adequacy of that remedy in the particular case. *Nelson* is consistent with our approach to exhaustion generally, *see, e.g., First Jersey Securities Inc. v. Bergen*, 605 F.2d 690, 696 (3d Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980), which favors exhaustion but does not require it where the administrative remedy would be inadequate. In this case, the AFBCMR cannot afford Jorden satisfactory relief. As defendants concede, the AFBCMR, a federal Board, cannot order Jorden's reinstatement to the state Guard. *See Penagaricano v. Llenza*, 747 F.2d 55, 57 (1st Cir.1984). Moreover, the AFBCMR is a military Board that is arguably not empowered to rein-

## II. Plaintiff's Damages Action

### A. History of the Availability of Damages Suits Against Military Officers

Military officers have not always been afforded absolute immunity from damages suits. The leading nineteenth century case is *Wilkes v. Dinsman*, 48 U.S. (7 How.) 89, 12 L.Ed. 618 (1849), after remand *Dinsman v. Wilkes*, 53 U.S. (12 How.) 390, 13 L.Ed. 1036 (1851), in which the Court held that a naval commander alleged to have flogged and imprisoned an enlisted seaman could be held liable for damages at common law.

The ability of servicemen and other aggrieved persons to recover damages in a military context was dealt a severe blow by the Supreme Court's decision in *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). In *Feres*, the Court held that the United States was immune from liability under the Federal Tort Claims Act for torts arising out of or incident to military service. The Court was concerned, *inter alia*, with deference to Congress, which had provided a system of military remedies. Although *Feres* does not explicitly rely on the special requirements of military discipline, in subsequent cases the Court has observed that *"Feres* seems best explained by the 'peculiar and special relationship of the soldiers to his superiors, [and] the effect of the maintenance of such suits on discipline....'" *United States v. Muniz*, 374 U.S. 150, 162, 83 S.Ct. 1850, 1858, 10 L.Ed.2d 805 (1963), quoting *United States v. Brown*, 348 U.S. 110, 112, 75 S.Ct. 141, 143, 99 L.Ed. 139 (1954). *Feres* did not address the propriety of common law suits against *individual officers*, such as the action brought in *Wilkes*.

The availability of damages relief against military officers was subsequently affected by two Supreme Court cases that did not involve military officers but whose holdings concerned damages actions against government officials in general. In *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Court greatly expanded the potential liability of state officers under § 1983 [6] and in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Court recognized a damages action brought directly under the Constitution against federal officers. In the aftermath of these cases, both the Supreme Court and this circuit gave their imprimatur to damage suits against military officials for the violation of constitutional rights. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (Adjutant General of Ohio and subordinate officers not immune from damage suits arising out of events in connection with the Kent State shooting); *Chaudoin v. Atkinson*, 494 F.2d 1323, 1332 (3d Cir. 1974) (remanding case to district court with instructions to award damages to guardsman in suit against Adjutant General of Delaware); *Lasher v. Shafer*, 460 F.2d 343, 348 (3d Cir.1972) (rejecting claim of automatic immunity for state military officers in § 1983 suit and remanding for development of factual record to determine if immunity is appropriate).

However, in 1982, this court held that soldiers who alleged that they were ordered to stand in a field while a nuclear device was exploded nearby could not bring a *Bivens* damages action against their federal military officers. *Jaffe v. United*

---

state Jorden to his civilian technician position in any event. *See Rolles v. Civil Service Commission*, 512 F.2d 1319, 1326 (D.C.Cir.1975) ("[T]he Board does not have the authority or the power to order the reinstatement with back pay of an employee to a civilian position. The Board performs a purely military function.") Neither the district court nor defendants contend that there are adequate state remedies, and, in any event, the exhaustion of state administrative remedies is not required in § 1983

actions, *Patsy v. Florida Board of Regents*, 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982).

**6.** Prior to *Monroe* it was widely believed that § 1983's "color of law" requirement was met only where the state had authorized the conduct in question. *Monroe* clarified that the "color of law" requirement extended to "any official conduct—whether valid under state law or not." P. Schuck, *Suing Government* 48.

*States,* 663 F.2d 1226 (3d Cir.1981) (en banc), *cert. denied,* 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982) *(Jaffe II")*. We did not address whether the holding affected constitutional claims brought under § 1983 against *state* military officers.

One year later, in *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), the Supreme Court faced a *Bivens* claim for damages brought by servicemen against their naval officers alleging racial discrimination in making duty assignments, performing evaluations and imposing penalties. The Court essentially adopted the reasoning of *Feres,* finding that concern for military discipline and deference to Congress required rejection of the *Bivens* claim brought by the plaintiffs.

As noted, the district court found that *Chappell* barred Jorden's damages suit. Determining whether this holding was correct requires analysis of two issues. First, we must decide whether the reasoning of *Chappell,* which dealt with a *Bivens* claim against federal military officers, also applies to § 1983 actions against state military officers. Because we conclude that it does, we must then consider Jorden's contention that *Chappell* does not prohibit all or even most damages actions against military officers but compels a fact-specific inquiry into whether judicial review in a particular case will unduly interfere with the military mission.[7]

B. *Does* Chappell *Apply To § 1983 Actions?*

Jorden's counsel made clear at oral argument that the claim against Walker, the only federal military officer in the case, was for injunctive relief only. Thus, this case involves no *Bivens* damages claims. Rather, Jorden's damages claims are brought against state military officers un-

der the Reconstruction Civil Rights statutes. Because *Chappell* involved *Bivens* claims against federal military officers, and not § 1983 claims against state military officers, it is not clear whether *Chappell* controls this case. This uncertainty is heightened by two footnotes near the end of the *Chappell* opinion.

Footnote 2 distinguished *Wilkes v. Dinsman, supra,* on the ground that "[*Wilkes* ] involved a well-recognized common law cause of action ... and did not ask the Court to imply a new kind of cause of action." 462 U.S. at 305 n. 2, 103 S.Ct. at 2368 n. 2. In another footnote, the Court explicitly declined to address whether the plaintiffs' claim under 42 U.S.C. § 1985(3) was barred because the issue had not been briefed. *Id.* n. 3. These two footnotes lend credence to the view that *Chappell* was limited to *Bivens* claims (a "new" judicially-created remedy), and does not apply to damages claims brought under § 1983. Yet, the courts of appeals that have considered the question have, with little discussion, extended *Chappell* to bar actions brought against state military officers under § 1983. *Brown v. United States,* 739 F.2d 362, 367 (8th Cir.1984), *cert. denied* — U.S. —, 105 S.Ct. 3524, 87 L.Ed.2d 650 (1985); *Martelon v. Temple,* 747 F.2d 1348, 1350–51 (10th Cir.1984), *cert. denied* — U.S. —, 105 S.Ct. 2675, 86 L.Ed.2d 694 (1985). These courts have observed that the disruptive effect of damages suits on military discipline is the same regardless of whether the suit is a *Bivens* claim against federal military officers or a § 1983 claim against state military officers.[8] Thus, they have held that there is no "reasoned distinction for the purposes of the *Feres* doctrine between *Bivens*-type actions under the Constitution and actions brought under

---

7. We shall focus our analysis on *Chappell* because we find that *Jaffe v. United States,* 663 F.2d 1226 (3d Cir.1982) (en banc), *cert. denied,* 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982) *("Jaffe II")*, offers no additional illumination on the relevant questions. The district court and all of the parties similarly focused on *Chappell.*

8. It bears emphasis that in both *Brown* and *Martelon,* as in the instant case, the military officers were National Guard officers whose training and military exercises are generally integrated with the National defense.

a federal civil rights statute." *Brown,* 739 F.2d at 367.

We believe that the issue is more problematic than these courts have suggested. *Bivens* claims and § 1983 claims are not entirely parallel, for the former is a judicially-created remedy while the latter was created by Congress. As we noted in *Johnson v. Orr,* 780 F.2d at 395 n. 17 (3d Cir.1986), the concern for deference to Congress that may lead a court to preclude a *Bivens* action is not present where the preclusion of a § 1983 action is at issue. However, the Supreme Court in *Butz v. Economou,* 438 U.S. 478, 500, 98 S.Ct. 2894, 2907, 57 L.Ed.2d 895 (1978), left little doubt that where immunity of government officials is concerned, § 1983 and *Bivens* claims must be treated alike.

*Butz* posed the obverse situation of the instant case. In *Butz,* the government tried to argue that notwithstanding the fact that the Court had granted state officials only qualified immunity under § 1983, federal officials should receive greater immunity from *Bivens* claims. In the instant case, the Supreme Court having already held that federal military officials have immunity, the question is whether state officials should receive equal immunity. This distinction is not significant, however, given the unequivocal command of *Butz* that *Bivens* claims and § 1983 suits are to be treated as identical for the purposes of immunity:

> [I]n the absence of congressional direction to the contrary, there is no basis for according to federal officials a higher degree of immunity from liability when sued for a constitutional infringement as authorized by *Bivens* than is accorded state officials when sued for the identical violation under § 1983. The constitutional injuries made actionable by § 1983 are of no greater magnitude than those for which federal officials may be responsible. The pressures and uncertainties facing decisionmakers in state government are little if at all different from those affecting federal officials. We see no sense in holding a state governor lia-

ble but immunizing the head of a federal department; in holding the administrator of a federal hospital immune where the superintendent of a state hospital would be liable.... Moreover, the Government's analysis would place undue emphasis on the congressional origins of the cause of action in determining the level of immunity.... [W]e deem it untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials.

*Butz,* 438 U.S. at 500–02, 504, 98 S.Ct. at 2907–08, 2909. *Accord Harlow v. Fitzgerald,* 457 U.S. 800, 819 n. 30, 102 S.Ct. 2727, 2738 n. 30, 73 L.Ed.2d 396 (1982) (following *Butz* ).

■ A holding that *Chappell* applies to bar or limit § 1983 damages claim is troublesome in one respect. Immunity from § 1983 damages claims generally requires a court's determination that: 1) there was a common law immunity at the time of the passage of § 1983 in 1871; and 2) Congress did not seek to abolish that immunity in passing § 1983. *City of Newport v. Facts Concerts, Inc.,* 453 U.S. 247, 258–59, 101 S.Ct. 2748, 2755, 69 L.Ed.2d 616 (1981). *See also Tenney v. Brandhove,* 341 U.S. 367, 376–78, 71 S.Ct. 783, 788–89, 95 L.Ed. 1019 (1951) (legislators immune from § 1983 damages suit because Congress did not intend to abolish their common law immunity); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (same analysis leads Court to find judges immune from § 1983 damages actions). However, because *Chappell* dealt with a *Bivens* claim, the Court undertook no such inquiry (and, in fact, military officers were not absolutely immune from common law suits for damages when § 1983 was passed, *see supra* p. 103).

In sum, to apply *Chappell* to § 1983 actions is problematic because *Chappell* was based not on the existence of a common law immunity for military officers but on policy considerations that, while relevant to immunity of federal officers from

*Bivens* suits, may be less relevant to immunity of state officers from § 1983 suits.[9] Even if this argument is correct, however, *Butz* prevents us from adopting it. The argument contradicts the unequivocal command of *Butz* that immunity for federal officers from *Bivens* claims is identical to that of state officers from § 1983 suits.

Nor can we evade the command of *Butz* by stating that, as a matter of policy, immunity for federal military officers is more important than immunity for state military officers. Rather, we recognize that "[t]he Guard is an essential reserve component of the Armed Forces of the United States." *Gilligan v. Morgan,* 413 U.S. 1, 7, 93 S.Ct. 2440, 2444, 37 L.Ed.2d 407 (1973). It is common knowledge that, in the event of a surprise attack, the Guard may be the first line of defense. *See* 32 U.S.C. § 102 ("[I]t is essential that the strength and organization of the Army National Guard and the

Air National Guard as an integral part of the first line defense of the United States be maintained and assured at all times.") Indeed, Congress recently passed a resolution, Pub. L. No. 99–290, 100 Stat. 413 (1986), designed to "reaffirm Congressional recognition of the vital role played by members of the National Guard ... in the nation's armed forces." H.Rep. No. 504, 99th Cong., 2d Sess., *reprinted in* 1986 U.S. Code Cong & Ad. News 1294.

Thus, the conclusion that state military officers have at least a certain immunity from § 1983 damage actions is compelled by the combination of *Chappell* and *Butz:* the former disallowing a *Bivens* claim against federal military officials and the latter holding that *Bivens* claims and § 1983 suits must be treated the same for purposes of immunity.[10] Our next task is to determine the scope of that immunity.

9. One commentator made this point in criticizing *Harlow v. Fitzgerald, supra,* for treating § 1983 and *Bivens* claims as identical for immunity purposes:

> The abrogation of the subjective element of immunity in *Harlow,* however, was premised solely upon the Court's assessment of public policy. While this may be appropriate for *Bivens* actions, which are largely a creation of the judiciary, the Court does not have the discretion to depart from the intent of the legislature and apply its own notions of policy to section 1983 actions.
>
> As previously discussed, immunity to section 1983 liability is founded in Congress' presumed adoption of immunities that were established at common law. Therefore, the paramaters of the qualified immunity under section 1983 must be defined by reference to the common law.... The judicial abolition of the subjective element of the immunity for *Bivens* actions ... cannot and should not simply be extended to section 1983 actions. Only Congress may properly determine whether public policy mandates amending section 1983 ... for the immunity defense.

Gildin, *The Standard of Culpability In Section 1983 and* Bivens *Actions: The Prima Facie Case, Qualified Immunity And The Constitution,* 11 Hofstra L.Rev. 557, 587–88 (1983).

The question whether § 1983 and *Bivens* actions should be treated identically for immunity purposes turns, in part, on how much significance ought be attached to the fact that Congress has provided explicit statutory remedies against state officers but not against federal officers. *Compare* majority opinion in *Butz,* 438 U.S. at 502–03 n. 30, 98 S.Ct. at 2908–09 n. 30 (stating

that the fact that Congress created actions against state and not federal officers is a function of historical contingencies of 1871 and is no longer relevant) *with* dissenting opinion (Rehnquist, J.) at 525–26, 98 S.Ct. at 2920 (attaching great significance to Congress' choice to make state, but not federal, officers liable for constitutional violations and concluding that the notion "that there should be no difference in immunity between state and federal officials remains subject to serious doubt.")

10. Judge Gibbons would apparently limit *Butz* to its facts, and not read it to require that federal officials and state officials be treated alike for immunity purposes. However, he overlooks the significance of the Court's extensive discussion, *see supra* p. 105, designed to show that logic dictates that federal officials and their counterpart state officials should be equally susceptible or insusceptible to suit. Given this lesson of *Butz,* Judge Gibbons' other point, that *Chappell* is not actually an immunity decision, is insignificant. *Chappell* limits the availability of *Bivens* damages actions against federal military officials, and we would therefore contradict the logic of *Butz* if we did not similarly limit the availability of § 1983 damages actions against state military officials.

On the basis of *Nixon v. Fitzgerald* Judge Gibbons argues in his dissent that, as a general matter, analogy between the immunities accorded state and federal officials is improper. The *Nixon* Court did in fact reject such an analogy, but it did so because of "[t]he President's *unique* status under the Constitution." 457 U.S. 731 at 750, 102 S.Ct. 2690 at 2701, 73 L.Ed.2d 349

C. *The Scope of Chappell's Prohibition on Damage Claims*

■ We have just determined that, notwithstanding the fact that *Chappell* dealt with a *Bivens* claim against federal military officers whereas Jorden's damages claim is a § 1983 claim against state military officers, *Chappell* applies to this case. It does not necessarily follow, however, that Jorden's claim is barred. Rather, we must consider Jorden's contention that *Chappell* bars damages action only after a court has determined that, in a particular case, hearing a damages claim would threaten military discipline.

The majority of courts to consider the question have rejected that contention, holding instead that *Chappell* establishes a *per se* prohibition of damages actions against military officers for violations of constitutional rights. *Trerice v. Summons*, 755 F.2d 1081 (4th Cir.1985); *Martelon v. Temple*, 747 F.2d 1348 (10th Cir. 1984), *cert. denied* — U.S. —, 105 S.Ct. 2675, 86 L.Ed.2d 694 (1986); *Mollnow v. Carlton*, 716 F.2d 627 (9th Cir.1983), *cert. denied* 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 547 (1984); *Alvarez v. Wilson*, 600 F.Supp. 706 (N.D.Ill.1985). However, several courts have disagreed in whole or in part. *Stanley v. United States*, 574 F.Supp 474 (S.D.Fla.1983), *aff'd*, 786 F.2d 1490 (11th Cir.1986) (*Chappell* requires analysis of whether allowing suit in the particular case will threaten the military mission); *Shaw v. Gwatney*, 584 F.Supp. 1357, 1362 (E.D.Ark.1984) (*Chappell* requires balancing strength of the right and likely degree of interference with the military order for determining whether suit is barred); *cf. Brown v. United States*, 739 F.2d 362 (8th Cir.1984) (*Chappell* automatically bars damages actions except in rare case in which alleged conduct is entirely unrelated to military mission).

Jorden relies primarily on the reasoning of *Stanley v. United States*, 574 F.Supp. 474 (S.D.Fla.1983), *aff'd* 786 F.2d 1490 (11th Cir.1986),[11] which involved experimental administration of LSD to soldiers. *Stanley* held that *Chappell* required courts to undertake a fact-specific inquiry that focuses on the nature of the military conduct in question, *i.e.*, whether it was the kind of conduct that courts could not scrutinize without jeopardizing military discipline.

We believe that the *Stanley* court misread *Chappell*. It appears to have been influenced by the following statement in *Chappell*: "[N]or do we now hold, that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service." 462 U.S. at 304, 103 S.Ct. at 2368. The *Stanley* court saw that language as limiting *Chappell* to its facts. We disagree. This interpretation ignores the fact that the *Chappell* Court, following its qualification that it had not closed the door on all military claims, cited three cases to illustrate the kind of suits that remained viable: *Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980); *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); and *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). None of those cases involved *damages* actions against military officers. And almost immediately after these citations the Court stated: "We hold that enlisted military personnel may not maintain a suit to recover damages from a superior officer for alleged constitutional violations." 462 U.S. at 305, 103 S.Ct. at 2368.

The clear implication of *Chappell* is that while some non-damage constitutional claims involving the military remain viable, damage claims do not. The *Stanley* court's approach would frequently require

---

(1982) (emphasis added). Nothing in *Nixon* suggests that the state/federal analogy is improper for any other official, and as we have already discussed, at 105, *Butz* explicitly directs us to reason in this manner.

11. Jorden relied on the opinion of the Florida district court, because it was not affirmed until after the briefing and oral argument in this case had already occurred. However, the Eleventh Circuit adopted the district court's reasoning.

courts to make difficult and hair-splitting distinctions as to whether a particular claim was the sort that, if legally actionable, would threaten military discipline. This approach seems questionable as a matter of policy. In any event, we simply do not read *Chappell* as sanctioning this kind of case-by-case approach.

We thus believe that the Supreme Court was laying down a general rule barring damages actions by military personnel against superior officers for constitutional violations, rather than authorizing a fact-specific inquiry. The Eighth Circuit understands *Chappell* to leave room for an exception where the conduct complained of has "total antipathy to any conceivable military purpose." *Brown v. United States,* 739 F.2d 362, 367 (8th Cir.1984). The instant case does not give us occasion to evaluate the possibility that *Chappell* leaves room for such an exception because the immediate cause of Jorden's discharge was his disobedience of a military order from a superior officer; it cannot be said that the order had no "conceivable military purpose." Under the circumstances, *Chappell* clearly bars a § 1983 damages action.[12]

### III. *Jorden's Claims For Reinstatement*

Our conclusion in part II establishes that the district court was correct to dismiss Jorden's claim for damages. We now turn to his claim for injunctive relief, *i.e.,* reinstatement.

### A. *History of Availability Of Injunctive Relief Against The Military*

The Supreme Court has heard many cases involving claims for injunctive relief against the military without even suggesting that the claims were not reviewable in a civilian court. The most notable exception is *Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973), a case arising out of the Kent State shootings in 1970. Kent State students brought suit seeking far-reaching injunctive relief "to restrain [the governor] in the future from prematurely ordering National Guard troops" and "to restrain leaders of the National Guard from future violations of the students' national rights." *Id.* at 3, 93 S.Ct. at 2442. Finding that the relief requested was a "broad call on judicial power to assume continuing regulatory jurisdiction over the activities of the Ohio National Guard," a step that would require "a judicial evaluation of the appropriateness of the training, weaponry and orders of the Ohio National Guard," *id.* at 5–6, 93 S.Ct. at 2443 the Court declared the matter inappropriate for judicial resolution. However, the Court explicitly stated that its holding involved no broad rule:

[I]t should be clear that we neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law or for specific unlawful conduct by military

---

**12.** Jorden sought damages under 42 U.S.C. §§ 1985(3) and 1986 as well. Having determined that defendants are immune from a damages action under § 1983, we cannot see any basis for holding them susceptible to suit under §§ 1985 and 1986. *See Mollnow v. Carlton,* 716 F.2d 627, 629–30 (9th Cir.1983), *cert. denied* 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 126 (1984) (extending *Chappell* to bar claim under § 1985); *Elliot v. Perez,* 751 F.2d 1472 (5th Cir.1985) (treating § 1983 and § 1985 together for immunity purposes).

In addition, we must dismiss Jorden's common law cause of action. *Chappell* hinted that the common law cause of action in *Wilkes v. Dinsman* may remain viable, 462 U.S. at 305 n. 2, 103 S.Ct. at 2368 n. 2. However, *Wilkes* involved an oppressive and malicious flogging.

Especially in light of the recent decisions of the Court restricting the availability of damages actions against the military, we are unwilling to extend *Wilkes* beyond its facts. *See Trerice v. Summons,* 755 F.2d 1081, 1084 (4th Cir.1985). Jorden's allegations—that defendants gave him unfavorable treatment for unconstitutional reasons—resemble plaintiffs' allegations in *Chappell,* in which the Court found *Wilkes* inapposite, 462 U.S. at 305 n. 2, 103 S.Ct at 2368 n. 2. *Cf. Trerice v. Pedersen,* 769 F.2d 1398, 1404 (9th Cir.1985) (*Wilkes* no longer viable).

It is worth noting that we do not determine the availability of a damages action in a case like *Johnson v. Orr, supra* n. 2, where a Guard technician is dismissed from his civilian employment for circumstances arising wholly in the civilian context.

personnel, whether by way of damages or injunctive relief.

*Id.* at 11–12, 93 S.Ct. at 2446.

Several subsequent cases have confirmed that the Court has not established a *per se* rule that military matters are not subject to judicial review. *Rotsker v. Goldberg,* 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981) (equal protection challenge to all-male draft registration); *Brown v. Glines,* 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980) (first amendment attack on Air Force regulation with respect to circulation of petitions); *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (vagueness challenge to criminal provisions of military code); *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (equal protection challenge against statutes discriminating against women in military benefits).

*Chappell* made no direct reference to claims for injunctive relief against the military, but it did cite *Brown, Parker* and *Frontiero* as examples of suits against the military that remain viable. 462 U.S. at 304–05, 103 S.Ct. at 2367–68. Three years after *Chappell,* the Court heard another case involving a claim for injunctive relief in the military context, and made no mention of a reviewability problem. *Goldman v. Weinberger,* —— U.S. ——, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (naval officer's refusal to permit plaintiff to wear yarmulke upheld).

This court, too, has entertained suits for injunctive relief against the military. In *Jaffe v. United States,* 592 F.2d 712 (3d Cir.1979), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979) (*"Jaffe I"*), we reviewed the actions of the military under the Administrative Procedure Act. More recently, in *Dillard v. Brown,* 652 F.2d 316 (3d Cir.1981), we held that, as a general matter, requests for injunctive relief against the military are reviewable. We stated that the only exceptions to this rule were rare cases, such as *Gilligan v.*

Morgan, supra, where the kind of relief requested would involve the court in tasks well outside of its capacity and function. *See* discussion *infra* at 111.

**B.** *Should Jorden's Claims for Reinstatement Have Been Dismissed?*

■ Although the district court made no specific mention of Jorden's claims for injunctive relief, *i.e.,* reinstatement, it apparently found those claims barred by *Chappell.* We disagree. *Chappell* itself suggests that it leaves open claims for injunctive relief against the military, and has been so interpreted by every court to consider the question. Moreover, we find that permitting injunctive relief while denying a damages remedy is supported by considerations of policy. Finally, the law of this circuit dictates that Jorden's claim for injunctive relief be permitted.

As noted above, *Chappell* stated that it was not closing the door on claims against the military for constitutional violations, and cited as examples of viable actions three cases—*Brown, Frontiero,* and *Parker*—that involved injunctive relief. It is true that those cases, like *Rotsker,* involved facial constitutional challenges to regulations or statutes concerning the military. However, the Court in *Brown* expressly stated that judicial scrutiny was not limited to facial constitutional challenges; rather, legitimate constitutional claims could arise from the application of these statutes and regulations. 444 U.S. at 357 n. 15, 100 S.Ct. at 601 n. 15. The recent *Goldman* case involved such a challenge.

All of the courts to consider the question have held that *Chappell* leaves open claims by discharged military personnel for injunctive relief. *Ogden v. United States,* 758 F.2d 1168 (7th Cir.1985); *Penagaricano v. Llenza,* 747 F.2d 55 (1st Cir.1984); *Gant v. Binder,* 596 F.Supp. 757 (D.Neb.1984), *aff'd,* 766 F.2d 358 (8th Cir.1986).[13] In *Ogden,* in which plaintiff alleged that his

---

**13.** The Eighth Circuit assumed without deciding that the district court was correct in finding that

*Chappell* did not bar the injunctive claim.

military superior's application of an "off-limits" declaration violated his first amendment rights, the court said:

The district court did not expressly deny plaintiffs' claims for injunctive relief nor specifically consider whether the *Chappell* decision was also a bar to such relief. We hold that *Chappell* does not preclude an equitable remedy and that the district court erred in not addressing the injunctive requests. *Chappell* contains the express qualification that military personnel are not barred from "all redress in civilian courts for constitutional wrongs suffered in the course of military service." The Court cited three of its decisions as supporting this proposition. These cases involved facial attacks on the constitutionality of statutes and regulations concerning the military ... *The suits requested nonmonetary relief, as opposed to the monetary damages sought in Chappell* ... The implication that the Court could forbid the unconstitutional prohibition of protected conduct is clear.

758 F.2d at 1175–76 (emphasis added). Although *Ogden* did not involve a suit for reinstatement, its analysis supports the view that *Chappell* ruled out only claims for damages, not injunctive relief. Moreover, *Gant* and *Penagaricano*, which did involve claims for reinstatement, held that *Chappell* leaves available suits for reinstatement by discharged military personnel.

One of the concerns underlying *Chappell* is the need for military officers' uninhibited decisionmaking, and the threat to such decisionmaking if officers fear personal liability. The threat of personal liability for damages poses a unique deterrent to vigorous decisionmaking. *See generally,* P. Schuck, *Suing Government* (1983). On the other hand, the possibility that an offi-cer may be compelled by a court to cease applying a particular regulation in an arbitrary manner, or to reinstate an improperly discharged soldier, poses much less of a threat to vigorous decisionmaking. Indeed, it is for this reason that government officials are often immune from damages but susceptible to injunctions. *See, e.g., Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 737, 100 S.Ct. 1967, 1977, 64 L.Ed.2d 641 (1980) ("Prosecutors enjoy absolute immunity from damages liability ... but they are natural targets for § 1983 injunctive suits.").

Our analysis of *Chappell,* however, does not end the case. For while *Chappell* did not require the district court to dismiss Jorden's claim for reinstatement, it did not require the court to hear the claim. Absent a decree from the Supreme Court to the contrary, lower courts must apply their own jurisprudence to determine whether claims for injunctive relief against the military are appropriate. For example, after finding that *Chappell* did not bar plaintiff's claim, the First Circuit in *Pengaricano* dismissed the claim by virtue of First Circuit law on reviewability of claims involving the military. Thus, the question whether the district court erred in dismissing Jorden's claim for reinstatement turns on this court's approach to the availability of claims for injunctive relief against military officials.

As noted, the law in this circuit, established in *Dillard v. Brown,* heavily disfavors finding injunctive claims against the military non-reviewable.[14] *Dillard* involved a woman Guard member who was discharged from the Guard because of a regulation that forbade the enlistment of single parents. She alleged that the Guard had applied the regulation in an unconstitutionally discriminatory manner.[15] The district court had held that this military mat-

---

**14.** It is clear that *Dillard* was not overruled by either *Chappell* or *Jaffe II.* We have already discussed at length the fact that *Chappell* does not bar claims for injunctive relief. Similarly, in *Jaffe II* we explicitly stated that "what we are called upon to decide is simply whether plain-tiffs are entitled to money damages." 663 F.2d at 1240.

**15.** She also alleged that the regulation was facially unconstitutional, a claim this court appeared to regard as frivolous. 652 F.2d at 324 n. 6.

ter was not reviewable in the civilian courts. This court reversed, holding that suits against the military are non-cognizable in federal court only in the rare case where finding for plaintiff "require[s] a court to run the military." 652 F.2d at 322. We gave as one example *Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973), in which the plaintiffs asked the court to engage in ongoing regulatory supervision of the Guard. Absent such an extreme case, "[i]f the military justification outweighs the infringement of the plaintiff's individual freedom, we may hold for the military *on the merits*, but we will not find the claim to be non-justiciable." *Dillard*, at 323–24 (emphasis added).[16]

█ Like the plaintiff in *Dillard*, Jorden alleges that he was discharged in violation of his constitutional rights. Also like plaintiff in *Dillard*, if Jorden establishes a constitutional violation, the remedy will be a court-ordered reinstatement, rather than the kind of ongoing judicial oversight held inappropriate in *Gilligan*. Under *Dillard*, Jorden's claims for reinstatement are reviewable.

As we have explained above, *Chappell* neither required nor forbade the district court from dismissing Jorden's claims for reinstatement. We believe the law of this circuit, supported by considerations of policy, dictates that these claims should not have been dismissed.[17]

### IV. *Conclusion*

For the reasons stated above, we hold that the district court was correct in dismissing Jorden's damages claims, but incorrect in dismissing his claims for reinstatement. Thus, on remand, if Jorden can demonstrate that the discharges violated his constitutional rights, he is entitled to reinstatement.

We shall affirm the judgment of the district court insofar as it dismisses plaintiff's damages claims and dismisses all claims against the NGB. We shall reverse the judgment of the district court insofar as it dismisses plaintiff's claims for injunctive relief against the individual defendants, and shall remand this case for further proceedings.

GIBBONS, Circuit Judge, dissenting.

I join the opinion of the court to the extent that it reverses the district court's dismissal of Jorden's claims for injunctive relief. However, I disagree with the majority's disposition of the damage claims, and I dissent on this point.

The issue presented by Jorden's appeal of the district court's dismissal of his damage claims is whether a state national guard official is immune from a section 1983 suit brought by another member of the national guard unit. The Supreme Court frequently has addressed claims bearing on immunities available to section 1983 defendants and in doing so has deline-

---

**16.** In *Dillard* we explicitly rejected the test set forth by the Fifth Circuit in *Mindes v. Seaman*, 453 F.2d 197 (5th Cir.1971), for determining whether a court should hear a particular claim involving the military. *See* Note, *Judicial Review of Constitutional Claims Against the Military*, 84 Colum.L.Rev. 387 (1984) (praising *Dillard* as superior approach to *Mindes*). The *Mindes* test requires balancing, *inter alia*, the importance of the constitutional right asserted and the anticipated extent to which review will interfere with the military mission. We note that Jorden's claim would likely be reviewable under a *Mindes* balance. He alleges race discrimination and retaliation for the exercise of politically-related speech, both of which are very important constitutional claims. Moreover, reviewing the military order in question, an unusual order affecting only one individual and occurring not only off the battlefield but during a time when the plaintiff was not in active service, is not likely to have a deleterious effect on military decisionmaking generally.

**17.** Obviously, the claims for reinstatement against state defendants are properly brought under § 1983. Jurisdiction over defendant Walker, Chief of the NGB, is maintainable either under § 1983 or directly under the Constitution. *See Knights of the Klu Klux Klan v. East Baton Rouge Parish*, 735 F.2d 895, 900 (5th Cir. 1984) (federal officials who conspire or act jointly with state officials may be liable under § 1983); *Reuber v. United States*, 750 F.2d 1039, 1061 (D.C.Cir.1984) (Federal injunctive relief is available directly under the Constitution against federal actors committing constitutional violations).

ated a relatively straightforward analysis for assessing such claims. Resort to that controlling analysis in this case makes quite clear that the defendants here are not immune from damage liability under section 1983.

In assessing immunity claims by 1983 defendants, the Court first has looked to see if any relevant immunity existed prior to the enactment of section 1983. If such immunity did exist, the Court has then looked at the legislative history that accompanied enactment of section 1983 to see if it reveals any congressional intent to abolish that immunity. Should no such intent manifest itself, the Court finally has weighed policy considerations relevant to the asserted immunity. Only when all three conditions have been satisfied—the existence of preexisting immunity, the absence of congressional intent to abolish that immunity, and the absence of policies disfavoring immunity—has the Court held the defendant to be immune. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 258–71, 101 S.Ct. 2748, 2755–62, 69 L.Ed.2d 616 (1981) ("Because absolute immunity from such damages obtained at common law and was undisturbed by the 42d Congress, and because that immunity is compatible with both the purposes of § 1983 and general principles of public policy, we hold that a municipality is immune from punitive damages under 42 U.S.C. § 1983."); *Imbler v. Pachtman,* 424 U.S. 409, 417–29, 96 S.Ct. 984, 988–94, 47 L.Ed.2d 128 (1976) (employing same analysis in holding that state prosecutors are immune from section 1983 damage suits in certain circumstances); *Schueur v. Rhodes,* 416 U.S. 232, 238–49, 94 S.Ct. 1683, 1687–93, 40 L.Ed.2d 90 (1974) (employing same analysis in holding that a state governor, senior state national guard officers, and the president of a state-controlled university were not absolutely immune from section 1983 damage suits in certain circumstances); *Pierson v. Ray,* 386 U.S. 547, 553–57, 87 S.Ct. 1213, 1217–

19, 18 L.Ed.2d 288 (1967) (employing same analysis in holding that a state judicial officer was absolutely immune and state police officers had good-faith immunity from section 1983 damage suits in certain circumstances); *cf. Tenney v. Brandhove,* 341 U.S. 367, 372–76, 71 S.Ct. 783, 786–88, 95 L.Ed. 1019 (1951) (employing similar analysis in holding that immunity-like privilege accorded legislators immunized state legislators from section 1983 damage suits in certain circumstances).

In this case, in which state national guard officers contend that they are absolutely immune from a damage suit brought by a subordinate, one cannot progress past the first step of the analysis. Not only were military officers not immune from such damage actions prior to enactment of section 1983, the Supreme Court, in a case decided shortly before the passage of section 1983, held expressly that they were liable in such actions. *See Wilkes v. Dinsman,* 48 U.S. 93, 135–37, 7 How. 88, 128–30, 12 L.Ed. 618 (1849) (reversing trial court dismissal of enlisted man's suit against superior officer and holding that defendant officer was not absolutely immune from damage action).[1] Thus, unless Judge Becker is prepared to argue that in enacting section 1983 Congress *created* a new immunity available to the defendants in this case, controlling precedent precludes any holding that the defendants in this case are immune to the section 1983 damage claim.

To his credit, Judge Becker acknowledges the Supreme Court's methodology for evaluating immunity claims asserted by state officials defending section 1983 suits, at 106, and notes that prior to the enactment of section 1983 military officials were not immune from damage suits, at 105. However, other than to note that his holding is "troublesome in one respect," at 103, he offers no explanation of how the holding squares with the acknowledged

---

**1.** The Court subsequently affirmed this holding in *Dinsman v. Wilkes,* 53 U.S. 414, 428, 430, 12

How. 402–03, 404–05, 13 L.Ed. 1036 (1851).

methodology or with the noted immunity law.

What Judge Becker does offer in defense of his holding is *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), and *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). More specifically, he asserts first that *Butz* stands for the proposition that the immunity available to section 1983 defendants is the same as that available to similar defendants sued under a *Bivens* theory. From this he argues that, because, according to him, the Supreme Court held in *Chappell* that federal military officers are immune from *Bivens'* suits, state national guard officers are thus immune from section 1983 damage suits. At 105–106. This argument is without merit.

First, Judge Becker mischaracterizes the holding of *Butz.* In that case the plaintiffs brought a *Bivens* action against officials of the executive branch of the federal government. The district court and the court of appeals had rejected the defendants' assertions that they were absolutely immune, and the defendants had appealed. In assessing the defendants' claim to absolute immunity, the Court canvassed one hundred and fifty years of Supreme Court case law that had held federal executive branch officials to be liable in damage suits in various circumstances, *see id.* 438 U.S. at 486–89, 98 S.Ct. at 2900–02, and also reviewed cases that had held that state officials were not absolutely immune from section 1983 damage actions, *see id.* at 496–504, 98 S.Ct. at 2905–09. Relying on these two lines of cases, the Court held that the defendants were not absolutely immune from *Bivens* damage liability. In so holding the Court, using the language quoted by Judge Becker, at 106, rejected the defendants' assertion that they were entitled to greater immunity than were their state counterparts.

Judge Becker reads *Butz* to stand for the "unequivocal command ... that *Bivens'* claims and § 1983 suits are to be treated as identical for the purpose of immunity." At 106. To the extent that statement suggests—as Judge Becker's analysis indicates—that *Butz* holds that any state defendant sued for damages under section 1983 is absolutely immune if that defendant's federal counterpart would be absolutely immune to a *Bivens* claim, he is distorting *Butz.* Furthermore, implicit in such a suggestion is the assertion that *Butz* modifies the cases in which the Court has delineated pellucidly the analysis—discussed above—appropriate for determining when state officials are immune from section 1983 damage actions. Nothing in *Butz,* or in *Fact Concerts,* which was decided after *Butz,* supports such a novel assertion.

Even if one were to assume for the purposes of argument that *Butz* establishes the proposition for which Judge Becker cites it, the reasoning underlying his resolution of the immunity issue is still flawed. Judge Becker argues that in light of *Butz* the state national guard defendants are immune from this section 1983 suit because, he asserts, the Supreme Court held in *Chappell* that federal military officials are immune to *Bivens* suits. Yet this argument is unavailing, for *Chappell* does not hold what Judge Becker suggests it does.

In *Chappell* enlisted naval men filed a *Bivens* suit against their superior officers, seeking damages for alleged constitutional violations. The district court dismissed the plaintiffs' complaint on the grounds that the underlying military actions could not be reviewed by a civilian court, that the defendants were immune, and that the plaintiffs had failed to exhaust administrative remedies. 462 U.S. at 298, 103 S.Ct. at 2364–65. The Court of Appeals for the Ninth Circuit reversed, holding that the district court had incorrectly assessed the justiciability and immunity claims. *Id.* The defendants then appealed to the Supreme Court.

In a unanimous decision the Court reversed the Ninth Circuit. However, contrary to the necessary implication of Judge Becker's argument, that reversal was not predicated on the conclusion that the defendants were immune from suit. Indeed,

it is quite clear that the Court did not address the issue of the defendants' immunity. Rather, the decision dealt only with the propriety of extending the judicially-created *Bivens* remedy to the plaintiffs, as the Court focused exclusively on whether the "special factors counselling hesitation" were present. *See id.* at 298–304, 103 S.Ct. at 2364–68. This reading of *Chappell* is corroborated by the Court's express reference to *Wilkes*, which it distinguished on the grounds that "it involved a well-recognized common-law cause of action ... and did not ask the Court to imply a new kind of cause of action." *Id.* at 305 n. 2, 103 S.Ct. at 2368 n. 2.

Finally, the issue remains whether the state national guard officials whose liability we consider here are the same as the federal naval officers whose liability the Court considered in *Chappell.* Resolution of this issue is critical because, even if Judge Becker's interpretation of *Butz* and *Chappell* were correct, that interpretation would allow one to conclude that the defendants here are immune from suit only if one concluded that they are state equivalents of the federal officials who were the defendants in *Chappell.*

Judge Becker does not attempt to argue that for the purposes of his analysis state national guard officials are the same as federal military officers. Rather, he sidesteps the issue by asserting blithely that we cannot "evade the command of *Butz* by stating that, as a matter of policy, immunity for federal military officers is more important than immunity for state military officers." At 106. This position is contrary to Supreme Court precedent. In *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), the Court, in considering the President's immunity to civil liability, faced the argument that, because it had held in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), that governors were not absolutely immune from civil liability, the President, by virtue of the similarity of his position to that of a governor, also was not absolutely

immune. The Court expressly rejected this argument, choosing instead to assess the propriety of absolute immunity in light of the President's specific constitutional responsibilities. *Id.* 457 U.S. at 749–50, 102 S.Ct. at 2701. The Court's resort to this analysis makes clear that the Courts of Appeals, when considering granting to state officials immunities conferred upon their federal analogues, should not, as Judge Becker does, automatically immunize the state officials.

Turning to the substance of the matter, the federal military and state national guards differ in obvious and significant ways. As the Court explained in *Chappell,* the principal rationale for barring intramilitary damage actions by federal personnel is the concern for "disruption of the peculiar and special relationship of the soldier to his superiors that might result if the soldier were allowed to hale his superiors into court." 462 U.S. at 304, 103 S.Ct. at 2637 (citations and internal punctuation omitted). Whatever one might think of the validity of this reasoning as it pertains to the federal military, it simply is not relevant to state national guards. While those organizations have their military aspects, they are principally civilian in character, and the interrelationships of their members are principally civilian in character. The specifics of this case highlight these facts. Jorden was hired by the PaANG as a civilian technician, and he enlisted only because membership in the guard was a prerequisite to civilian employment. As a member he was required to serve in a military capacity for only fifteen days out of the year. During the rest of the time he served as a civilian employee and was not subject to military command. Thus it is quite clear that the attenuated concern for military discipline in this context bears no resemblance to the concern for such in the federal context. Consequently, the rationale for shielding federal military officers from damage suits does not support shielding state national guard officials from similar suits.[2]

---

**2.** Judge Becker attempts to equate state national

guards with the federal military by pointing out

Judge Becker's argument that the Supreme Court's holdings in *Butz* and *Chappell* compel the conclusion that the state national guard officers who are the defendants in the case before us are immune to a section 1983 damage suit is indefensible. Further, controlling Supreme Court precedent governing the recognition of immunities available to section 1983 defendants makes clear that these defendants are not absolutely immune from a section 1983 suit for damages. I therefore dissent from the majority opinion to the extent it holds otherwise.

that national guards are federal reserve components and by noting that they might be involved in hostilities in case of a "surprise attack" on this country. At 106–107. By this reasoning, the military-discipline rationale of *Chappell* would bar conscriptable male civilians from suing military officials for damages, for they are as likely to be involved in hostilities as is any member of a state national guard.

Furthermore, Judge Becker's effort to equate state national guards with the federal military ignores the important differences in the roles of those two organizations. State national guards serve to protect the states from domestic, civil disorder. By contrast the federal military—and the national guards, when federalized—serve to protect the country from external threats. Indeed, federal law prohibits the federal military from participating in domestic security operations. *See* Posse Comitatus Act, 18 U.S.C. § 1385 (1982).