**UNITED STATES of America, ex rel. Captain Jon T. KARR, Plaintiff,**

**v.**

**The Honorable Michael N. CASTLE, Governor of Delaware; Brigadier General Oscar E. Trivits, the Assistant Adjutant General for Army; Colonel Anthony J. Quattro, Chief of Staff for Army; Lieutenant Colonel Norman V. Cochran, Deputy Director of Personnel for Army, ex officio and in personam, their successors and assigns; Major General Arthur Episcopo, The Adjutant General of Delaware, ex officio; Major General Joseph M. Lank, in personam; The Department of Military Affairs, and The State of Delaware, Defendants.**

**Civ. A. No. 88–466 MMS.**

United States District Court,
D. Delaware.

Aug. 31, 1990.

John S. Malik, Wilmington, Del., John D. McLaughlin, Jr., Goshen, Ky., for plaintiff.

John J. Polk, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendants.

## OPINION

MURRAY M. SCHWARTZ, Senior · District Judge.

This action stems from the involuntary separation of Jon T. Karr (hereinafter "Karr"), a former Captain with the Dela-

ware Army National Guard ("DEARNG"), from a three year tour in the Active Guard/Reserve ("AGR") as Recruiting and Induction Officer, Delaware Army National Guard, based on substandard performance and dereliction of duty. In this action, plaintiff alleges that he was unlawfully discharged in an abuse of discretion by the Adjutant General[1] in retaliation for plaintiff's protection of a subordinate from racial discrimination and plaintiff's failure to illegally obtain incriminating statements from another subordinate. Plaintiff challenges the procedural and substantive regularity of the separation under the provisions of the fourteenth amendment and 42 U.S.C. §§ 1983, 1985 and 1986, as well as certain of the administrative decisions of DEARNG under the False Claims Act, 31 U.S.C. § 3729. Plaintiff seeks declaratory and injunctive relief and damages for defamation, malfeasance and misfeasance of public office, retaliatory discharge and intentional infliction of mental distress.[2] Plaintiff further seeks legal relief to recover from the United States those monies misappropriated by defendants. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361.

This matter is presently before the court on defendants' motion for summary judgment and plaintiff's motion for partial-summary judgment. Defendants moved for summary judgment contending that: (a) plaintiff cannot establish a discriminatory animus and, therefore, cannot establish a substantive due process violation, (b) plaintiff received sufficient process prior to termination and (c) plaintiff's claims for damages and back pay are barred by both the eleventh amendment and the immunities of military service. Plaintiff moved for partial summary judgment contending that he was denied the fundamental elements of procedural due process and that the evi-

---

1. By court order dated August 31, 1990, Major General Arthur Episcopo, Adjutant General of the State of Delaware, was added as a party defendant in his official capacity replacing Major General Lank who resigned during the pendency of this suit. Major General Lank remains a defendant in this litigation in his individual capacity. *See* Dkt. 57.

2. Although plaintiff seeks redress for a number of common law torts, the parties did not address those issues. Therefore, the court declines to discuss the plaintiff's claims arising under the common law.

dence of misconduct by Karr's supervisors poisoned the integrity of the fact-finding and decision making process thereby denying plaintiff substantive due process. Plaintiff contends that he is entitled to reinstatement, back pay and damages and that the individual officer defendants, except Governor Castle, are not entitled to intramilitary or official immunity and may be pursued for damages, including those for misappropriation under section 3729. Finally, plaintiff contends that the eleventh amendment does not bar Karr's claim against the State of Delaware.

The issues presented in these motions for summary judgment are (1) whether plaintiff was afforded the requisite procedural due process, (2) whether that process was tainted, and (3) what damages, if any, plaintiff is entitled to pursue.

## I. STATEMENT OF FACTS

On July 22, 1987, Colonel Norman Cochran ("Cochran") and Colonel Duane Austin ("Austin") issued an Officer Evaluation Report ("OER") on Karr's performance during the time period between June 16, 1986 and June 15, 1987. That report indicated that Karr's work habits were acceptable and particularly noted that he always exceeded requirements and should be promoted ahead of his contemporaries. Dkt. 47, Plaintiff's Appendix at A–60 (hereinafter "A–___"). However, under the grading system of the OER, plaintiff received a "2" on written communication skills and exercise of sound judgment, id., which means plaintiff's conduct in these two areas was criticized. It was also noted on the OER that "[d]uring the latter half of this rating period he has made no exerted effort to correct those faults (communication skills and exercise of judgment) that have caused him difficulty."

On September 15, 1987, Cochran told Karr that he could voluntarily request separation from active duty, be involuntarily separated or be non-judicially punished under Article 15, U.C.M.J., and that those options had already been approved by the command group of former Adjutant General Joseph Lank ("Lank"), Chief of Staff Anthony Trivits ("Trivits"), and former Assistant Adjutant General Oscar Quattro ("Quattro"). (A–38; A–10).

On September 23, 1987, Trivits told Karr he was displeased with Karr's numerical mission performance as recruiting officer, had long been aware of Karr's strained situation with Cochran, and had coordinated Cochran's pending request for involuntary removal. That same date Karr told Lank his concerns for Cochran's and Austin's motives, Trivits' lack of impartiality, and Karr's inability to compel testimony on his behalf.

Lank then received Karr's application for convening a court of inquiry pursuant to Article 135, U.C.M.J., 10 U.S.C. § 935 (A–69). On September 28, 1987, Lank issued a written decision to Karr regarding the application for convening a court of inquiry, holding that the U.C.M.J. did not apply to soldiers on active duty under 32 U.S.C. § 502(f), and that the matter would be resolved administratively under the provisions of paragraph 6–5, NGR 600–5. (A–63 and Dkt. 58).

On October 2, 1987, Cochran gave Karr a letter request for Karr's involuntary removal. (A–72). That letter enumerated the basis for the decision to seek involuntary removal for professional dereliction and substandard performance caused by acts of poor judgment. The letter also indicated that the recipient had "10 (ten) calendar days from receipt of this letter to forward rebuttal reasons cited for your removal." Further, the letter indicated that a JAGC officer could be requested to aid in the preparation of a rebuttal letter. (A–72).

On October 12, 1987, Karr gave Cochran his response with 42 enclosures. On October 14, 1987, Cochran informed Karr that he objected to his depiction as a "racist," refusing to forward Karr's response through the chain of command unless all such references were removed. On October 17, 1987, Karr gave a corrected copy of his response, with certain modifications, directly to Trivits, over Cochran's objections. (A–38; A–74).

On December 2, 1987, Cochran reprimanded Karr for his poor exercise of judgment regarding the incident relating to Major Peggy McDermott, Medical Recruiting Officer. (A–82). Cochran had directed Karr to confront McDermott concerning critical comments regarding Trivits' performance of duty that allegedly had resulted in the expulsion of the 116th MASH from Fort Dix, New Jersey, in May 1987. Karr was directed to ascertain the truth or falsity of the allegations, and, if true, to obtain a written statement from McDermott concerning her role in the accusations. Karr failed to obtain the written statement, (A–77; A–78), as a result of giving her *Miranda* warnings. Further, Karr drove McDermott to Lank's home on November 23, 1987, remaining in the car, while McDermott discussed with Lank her concerns about Trivits.

On December 5, 1987, Karr gave Cochran his response to the reprimand. (A–77). Between December 1 and 8, 1987, Trivits' recommendation to Lank regarding Karr's disposition changed to a "firm recommendation" for termination. (A–32; A–69).[3] The impact of the McDermott incident on Karr's ultimate discharge is reflected ambiguously in Lank's deposition, in which he testified:

Q: During that again same time frame, 27 October until 8 December of 1987, did General Trivits' discussions with you regarding the resolution of the Karr problem change at all?

A: I think they did.

Q: In what way did they change?

A: They changed into making a firm recommendation.

Q: And the firm recommendation was what?

A: To eliminate him from the tour.

Q: So can I infer from that that earlier he had counseled the advisability of a less serious—

A: He had put forth the options which I had. I think that probably the last

part of that particular package indicated that he leaned toward the elimination or removal from tour.

Q: But you feel that by the end his recommendation was much stronger than it had been earlier on?

A: No question. There were more things to look at at that point.

Q: And what things to look at were those?

A: Well, the McDermott incident.

Q: Anything else?

A: Not that I recall.

On December 8, 1987, Karr again asked Lank to convene a court of inquiry, or absent same, to order his criminal trial by general court-martial for the charge of dereliction of duty. Article 92, U.C.M.J., 10 U.S.C. § 892. (A–85). Lank rejected both requests.

On December 31, 1987, Karr was separated from active military duty, and he reverted to part-time military status under Cochran's supervision. On January 8, 1988, Karr requested transfer from the DEARNG to the United States Army Reserve (USAR), (A–86), which was accomplished on January 15, 1988. (A–87).

On February 1, 1988, Karr wrote Defendant Castle in his capacity as commander-in-chief, and lodged a formal complaint of wrong by his commanding officer in accordance with Article 138, U.C.M.J., 10 U.S.C. § 938 (A–89; A–90). Castle's legal counsel responded that "[a]fter reviewing [Karr's] letter and analyzing the procedures utilized in effectuating your dismissal, . . . the Governor must support the decision of Adjutant General Lank in this matter." (A–91).

On March 1, 1988, Chief Warrant Officer Kenneth Rhoads, who worked for Cochran, sent Karr for his comment an OER covering the period June 16, 1986 to December 31, 1987. On March 20, 1988, Karr responded to the contemplated OER, noting

---

**3.** From the record, notwithstanding Lank's deposition testimony, it appears Trivits' original October 27, 1987, recommendation was unequivocal. "I recommend that Captain Jon T. Karr be

processed for involuntary removal from the Delaware Army National Guard AGR program. . . ." Dkt. 56 at p. 4.

significant inaccuracies. (A–92). On May 6, 1988, Cochran forwarded to Karr a copy of his final OER. On May 18, 1988, Karr responded noting regulatory discrepancies and objecting to his personal vilification by Cochran. Karr specifically requested enclosure of his response to Cochran's original request for removal, with enclosures, prior to the regulatorily required review of the relief for cause and OER.

On June 11, 1988, Trivits sent Karr a supplementary review of the OER in question, noting that he conducted a review of the OER in question, and that it was complete and correct as written. (A–95).

## II. DISCUSSION

### A. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

■ When the movant has carried its burden under Rule 56(e), the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both *genuine* and *material. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A dispute over facts is "material" if, under the substantive law, it would affect the outcome of the suit. *Id.* 477 U.S. at 248, 106 S.Ct. at 2510. A factual dispute is "genuine" if a reasonable jury could return a verdict for the non-movant. *Id.*

■ The burden of proof also plays a role in deciding summary judgment motions. Summary judgment will be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Any inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing summary judgment. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). "On cross-motions for summary judgment the same burdens would apply." *Peters Township School District v. The Hartford Accident and Indemnity Company*, 833 F.2d 32, 34 (3d Cir.1987).

■ The "very mission" of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed.R. Civ.P. 56 advisory committee note to the 1963 Amendment. If wisely applied, the summary judgment procedure will eliminate useless trials. 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* § 56.02[1] (1988). However, summary judgment is not a substitute for trial and should not be used as a shortcut to avoid trial when a genuine issue of material fact remains in dispute.

■ The standard for summary judgment is similar to that for a directed verdict. *Anderson v. Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12 ("In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."). This does not mean, however, that the court in deciding a motion for summary judgment may weigh the evidence. The court should not grant summary judgment merely because it believes the movant will prevail at trial. Nor should the court grant summary judgment in the belief that a jury verdict for the non-movant at trial would be set aside as against the weight of the evidence. *See* 6 J. Moore & J. Wicker, *supra* at § 56.15[6]. Furthermore, the court should not grant summary judgment

unless it is reasonably certain that judgment may be justly rendered without a trial. *Id.*

### B. *Conflicting Regulations*

■ The first issue is whether the regulations upon which plaintiff's separation was based are inconsistent with the protections and benefits afforded and are, therefore, invalid. The procedures for separation, retention and retirement from the AGR program are set forth in Chapter 6 of the National Guard Regulations, entitled "The Active Guard/Reserve (AGR) Program Management of Title 32 USC Full Time National Guard Personnel" (hereinafter "NGR ___"). Plaintiff contends that NGR 600–5 is invalid as applied in that it is inconsistent with the background military regulations which he asserts govern those regulations promulgated by the National Guard as applied to the Active/Guard Reserve program. In the alternative, plaintiff contends that the Delaware Code extends the regulations of the federal military to the state national guard such that DEARNG would be bound by federal military regulations.

Karr's orders, (A–40–2), indicate that although Karr serves in the DEARNG pursuant to 32 U.S.C. § 502(f), he may be *ordered* into active duty and be federalized under 10 U.S.C. § 672(d). This language would appear to indicate that Karr served in both the DEARNG and the Army National Guard of the United States ("ARNGUS").[4] *See* Major Thomas F. England, *The Active Guard/Reserve Program: A New Military Personel Status,* 106 Mil.L. Rev. 1 (1984) (hereinafter "England article"). As promulgated, there was some question as to whether AGR personnel serving under 32 U.S.C. § 502(f), as in this case, served in a federal or a state capacity. However, the intent of Congress was more fully set forth in H.R.Rep. No. 943, 97th Cong., 2d Session 31 (1982), which stated that "[t]he intent of Congress was, and is, that National Guard personnel serving in the 'Full–Time Manning Program' now included in a DOD program called Active Guard and Reserve (AGR) serve under 32 U.S.C. 502(f) in conventional National Guard status, i.e., under State control as opposed to service in the active military service of the United States in Reserves of the Army or Reserves of the Air Force status." Thus, National Guard AGR personnel are on full-time duty under state control,[5] and are not automatically bestowed the benefits and privileges of federal service.

---

4. The AGR program created a new status of military personnel dedicated to the full-time support of the National Guard. The creation of the AGR program is part of an increasing emphasis on the use of Reserves to augment active forces. However, it is important not to confuse the Army and Air National Guards of the United States, ARNGUS and ANGUS, respectively, with the National Guard of the various states. The National Guard is part of the organized militia of the states. It does not become a part of the Armed Forces of the United States unless it is "called" into federal service for one of three reasons specified in the Constitution: to execute the laws of the United States; to suppress insurrections; or to repel invasions.

In 1933, Congress anticipated that these restraints on the National Guard might hinder the use of the National Guard and therefore created the concept of the National Guard of the United States. These organizations permit qualifying members of the National Guard to acquire a second military status as Reserves of the United States Armed Forces. Thus, all members of the ARNGUS and ANGUS are also members of the National Guard. In contrast to the National Guard, the members of ARNGUS and ANGUS are "ordered" into active duty for any purpose specified by statute. The Department of Defense Authorization Act prescribes the reserve components of the Armed Forces as authorized to serve on full-time active duty for the purpose of organizing, administering, recruiting, instructing, or training the reserve components.

5. When the AGR program was first initiated, 32 U.S.C. § 335 afforded some AGR members the rights, privileges, and benefits of members called to active duty under 10 U.S.C. § 265 and for the purposes of sections 524(a) and 976 of said title. That section was repealed in 1984 and replaced with the statement of Congressional intent.

In this case, Karr does carry a green identification card indicating full time military status, rather than National Guard status. As National Guard AGR personnel performing fulltime state duties, they may not be properly issued these cards. Although Karr may be carrying a green card and other indicia of federal service, the statement of Congressional intent compels the conclusion that Karr's benefits are controlled by the State. *See* England article, p. 22.

Plaintiff's argument that the regulations governing the AGR program should be read in light of the array of requirements which govern the federal armed forces would appear contrary to Congressional intent. Congress has traditionally maintained the distinction between the components of the military and the Courts have upheld those distinctions. Thus, to conclude that AGR, which Congress placed under state control, is bound by the DOD regulations governing the regular forces of the United States would be improper.

In the alternative, plaintiff contends that the Delaware Code extends the benefits and privileges of federal military service to the DEARNG. Plaintiff argues that the separation procedures of the United States Army, which provide for a pre-termination hearing, should govern separation from the DEARNG.

The General Assembly of the State of Delaware established the Delaware National Guard, which is governed by the provisions of 20 Del.C. § 101, et seq., and which is under the command of the Governor of Delaware and supervised by the Adjutant General, appointed by the Governor. 20 Del.C. §§ 103, 122, 123. Under Section 104, the Governor is empowered to issue regulations that have the force of law. That section further states that "[s]uch rules and regulations shall, so far as practicable, conform to the rules and regulations of the United States Army and United States Air Force...." 20 Del.C. § 104. Additionally, the Governor may promulgate regulations that are "necessary in order to conform to the requirements made by Congress for participation in federal appropriations for the National Guard." 20 Del.C. § 130. Under Section 103, the Delaware National Guard "shall conform to federal statutes and regulations relating to and governing the armed forces of the United States, insofar as they are applicable and not inconsistent with the Constitution of Delaware or this title." 20 Del. Code § 103.

As set forth in the statement of Congressional intent, plaintiff is a state employee, employed by the State to support the operations and maintenance of the National Guard. Such "[s]tate employees [are] governed by all the provisions of National Guard Bureau regulations concerning employment with the Delaware National Guard except where expressly prohibited by applicable law or regulation and/or modified by locally established provisions contained in this regulation." *Thorpe v. Lank, et al.*, 1988 U.S.Dist. LEXIS 14365, 14373–4, 1988 WESTLAW 135429 (D.Del. 1988) (unpublished opinion). The NGR regulations purport to contain information with respect to policy and procedures that will enable State adjutants general to develop an AGR career management program. NGR 600–5, ¶¶ 1–1 and 1–2.

The specific provision for separation for cause, as set forth in NGR 600–5 ¶ 6–5, indicates, *inter alia*, the grounds for separation, the requirements for counseling or reprimand prior to such request, and the procedures for separation. The procedures provide for written notice to the AGR member of the specific reasons for release and afford the AGR member an opportunity to comment on the initiating commander's recommendation. The procedures also indicate that "[i]f additional reasons for separation are included in the initiating commander's recommendation, the AGR member will be given the opportunity to rebut those additional reasons." *Id.* at ¶ 6–5d(1)(c). Those procedures do not provide an opportunity for a hearing.

In that the Delaware National Guard has adopted specific regulations which govern the separation procedures for the DEARNG, the court finds that AGR members are governed by those regulations. The adoption of detailed regulations regarding national guard privileges and benefits indicates a local modification of such requirements. The court will not disturb the applicability of those regulations.

*C. Specific Application of the NGR Regulations*

■ Plaintiff contends that the DEARNG regulations, even if valid, were improperly applied in this case. Plaintiff asserts that the regulations afford one

sought to be involuntarily terminated an opportunity to comment on the specific reasons for release. In this case, plaintiff argues that with respect to both the McDermott incident and Seaford incident,[6] and a Sergeant Rossi's memorandum (Dkt. 56A), although he formally responded to the reprimand, the McDermott and Seaford matters were never formally presented to him as part of the recommendation initiated by Cochran for involuntary termination. Similarly, he never knew about the Rossi memorandum although the same was contained in the Trivits' recommendation sent to Lank. Thus, in that those items formed a basis for Trivits' recommendation and Lank's ultimate decision to discharge plaintiff, the procedures under ¶ 6–5d(1)(b) were violated in that he never had an opportunity to address a formal rebuttal to those comments.

Further plaintiff alleges that his written response to the reprimand could not have been relied upon by Lank prior to making his determination to terminate. Karr had prepared his written response and it was prepared about 4:00 p.m. He then walked the copies around to headquarters and dropped off a copy in Cochran's office. At 4:15 p.m. of that same afternoon he was relieved. *See* Second Affidavit of Jon T. Karr, Dkt. 54, attachment.

Based on those allegations, a trier of fact could conclude that the procedures of NGR 600–5 ¶ 6–5 were violated due to defendants' failure to allow plaintiff to respond to additional allegations, such as the McDermott and Seaford incidents, and the Rossi memorandum which were before Lank when he ordered involuntary separation. The court concludes that material issues of fact preclude summary judgment as to whether the discharge was proper under the DEARNG separation requirements.

### D. *Procedural Due Process*

In addition, plaintiff alleges that defendants abrogated his right to due process in violation of state and federal law. "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents of State Colleges, et al. v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). A person deprived of either of these must be afforded some kind of a hearing. *Id.* at 570, n. 7, 92 S.Ct. at 2705, n. 7. Plaintiff alleges that his involuntary separation from DEARNG deprived him of due process in that his involuntary separation implicated a property and liberty interest and denied to him a hearing in which to present evidence and cross-examine witnesses.

The court must first determine whether the plaintiff has a property interest in the continuation of his three-year tour with the DEARNG. The due process clause does not define what is a protected property interest. A court must look to "rules or understandings that stem from an independent source such as state law— rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. at 2709. Property and liberty interests are not controlled by rigid definitions, but rather are defined by reference to state law. *Bishop v. Wood, et al.,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). However, an employee's subjective expectancy is insufficient to raise a constitutionally protected property interest. *Harris v. City of Wilmington, et al.,* 644 F.Supp. 1483, 1487 (D.Del.1986).

"There is ... a wealth of law which supports the proposition that a *reservist* does not have a property interest in continued employment." *May v. Gray,* 708 F.Supp. 716, 720 (E.D.N.C.1988) (citing *Sims v. Fox,* 505 F.2d 857, 861 (5th Cir. 1974), *en banc, cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 678 (1975); *Pauls v. Secretary of the Air Force,* 457 F.2d 294, 295 (1st Cir.1972); *Coppedge v. Marsh,*

---

6. The Seaford incident involved presentation of an award at which both plaintiff and Trivits were present. Apparently military protocol dictates that the senior officer should have presented the award. There is an issue of fact as to whether Karr afforded Trivits that opportunity and whether Trivits declined the opportunity to present the award.

532 F.Supp. 423, 429 (D.Kan.1982); *Woodward v. Moore,* 451 F.Supp. 346, 347 (D.D. C.1978)). Each of these cases notes the express statement by Congress that such reservists would serve at the pleasure of the Secretary concerned. Title 10 U.S.C. § 681(a) provides that:

> Except as otherwise provided in this title, the Secretary concerned may at any time release a Reserve under his jurisdiction from active duty.

This sentence has been interpreted to indicate that Congress was aware of the discharge mechanisms provided for reservists, and effectively limits the scope of any property interest in continued military employment.

Although plaintiff does not serve under section 681(a),[7] plaintiff's orders to full time National Guard Duty in Active Guard/Reserve status contemplates a three year period of duty, "unless sooner released or extended by proper authority," (A–40–2) to commence on June 16, 1986 and to terminate June 15, 1989. That language would appear to implicate the same logic which prevents a reservist from establishing a property interest in a tour of duty. Moreover, some NGR standards are subjective and constitute open end written criteria insufficient to create a protectible property interest. *See,* for example, NGR 600–5 ¶ 6–5c, entitled Grounds for Separation which includes, *inter alia,* paragraphs 6–5(2) "[m]oral or professional dereliction" and 6–5c(4) "[s]ubstandard duty performance." The Court concludes plaintiff has no property interest in his tour of duty with the DEARNG.

■ Apart from a property interest, a liberty interest is implicated only when separation from the military is carried out in a fashion so as to stigmatize the separated member. "It is established that discharge or termination of a government employee on the basis of false and stigmatizing reasons publicized by the governmental employer implicates a protected liberty interest in the employee's reputation and ability

to gain future employment." *Doe v. Garrett,* 903 F.2d 1455, 1462 (11th Cir.1990) (citing *Buxton v. Plant City,* 871 F.2d 1037, 1042–43 (11th Cir.1989)). A liberty interest can survive even where the withdrawal of employment does not impinge on a recognizable property interest. A "critical element of a claimed invasion of a reputational liberty interest, however, is the *falsity* of the government's asserted basis for the employment decision at issue." *Doe,* 903 F.2d at 1463 (emphasis in original).

"A 'stigma' may attach to a servicemember's discharge either from the characterization of the discharge or from the reasons recorded for the discharge, if such reasons present a 'derogatory connotation to the public at large.'" *Casey v. United States,* 8 Cl.Ct. 234, 241 (1985) (quoting *Birt v. United States,* 180 Ct.Cl. 910, 914 (1967)). The Claims Court reasoned that:

> Our primary concern in these cases is to prevent the Armed Forces from imposing a penalty on a discharged serviceman without affording him some basic constitutional protection, the essence of which is notice and a hearing.... [W]e will not permit the imposition of a stigma without respect for even the most elementary notions of due process of law.

*Id.* (citations omitted).

The Claims Court concluded that to brand the plaintiff on his discharge certificate as a drug abuser was "one more reason why this Court finds that the Army acted in an arbitrary and capricious manner in discharging him as it did." *Id.* at 242. Further, the Claims Court concluded that although the codes are private information known only within the Department of Defense and not to the public at large, the most important segment of society, i.e., prospective employers, do know and understand the importance of separation codes. "Thus, discharges that include stigmatizing and derogatory information must only be given to servicemen who have been afford-

---

7. One author indicates that the AGR would be considered under 10 U.S.C. § 681. *See* England article, p. 33. However, in that the statement of

congressional intent clearly places the AGR program under Title 32, the court will consider the AGR language apart from section 681.

ed elementary due process rights." *Id.* at 243.

On the other hand, in *Sims v. Fox*, 505 F.2d 857 (5th Cir.1974), *en banc,* the Fifth Circuit Appellate Court held that liberty is not infringed by the mere presence of derogatory information in confidential files and that the government has not infringed liberty unless it perpetuates untrue charges. In that case, there was no dispute that the derogatory information was true and it was unquestioned that the information would remain confidential. In the absence of such confidentiality and admission, the Fifth Circuit Appellate Court might have reversed its conclusion and found that a liberty interest has been violated. *See Swilley v. Alexander*, 629 F.2d 1018 (5th Cir.1980). Thus, although courts cite *Sims v. Fox* for the proposition that "[t]he honorable separation of a reservist never creates any procedural due process requirement," *Helmich v. Nibert*, 543 F.Supp. 725, 728 (D.Md.), *aff'd*, 696 F.2d 990 (4th Cir.1982), that unquestioned reliance is arguably misplaced on the liberty interest element. *See Neal v. Secretary of Navy*, 472 F.Supp. 763, 786 (E.D.Pa.1979) ("[B]ecause the only *publicly-communicated* information about Neal is not at all derogatory or stigmatizing, we are constrained to reject Neal's claim that defen-

dants' actions have deprived him of the liberty guaranteed him by the due process clause.").

In order for plaintiff to establish a liberty claim, he must show that his "good name, reputation honor, and community standing" are falsely attacked. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In this case, Karr has challenged the basis of his discharge and has alleged that the improper discharge has damaged his reputation and thereby precluded his ability to find suitable employment.[8] The Court finds that a stigma did arise from the discharge for substandard performance and requires the court to conclude that a liberty interest has been and continues to be asserted, although the factual underpinning is in dispute.

Once plaintiff establishes the existence of a property or liberty interest, he then has the burden of demonstrating that the process provided to him failed to meet the minimal process constitutionally guaranteed to him. "[T]he pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and

---

**8.** While at oral argument plaintiff apparently conceded that he was no longer pursuing a substantive due process claim based on a liberty interest because of no case authority, nonetheless plaintiff's argument unmistakably implicates a liberty interest. Plaintiff stated that:

MR. McLAUGHLIN: [I]f Karr had been dealt with properly, he would have had the liberty to seek additional AGR tours and additional access to other active duty programs or at least to have left the AGR program and sought civilian employment. As it is, because of his treatment by the Guard, he is a marked man. As such, he is not free to pursue his professional occupation....

 \* \* \* \* \* \*

THE COURT: Is that a separate liberty interest, that he can't get gainful employment suitable to his qualifications?

MR. McLAUGHLIN: I can make the bare assertion: Yes. But I can't support it with case law.

\* \* \* \* \* \*

THE COURT: I think we have covered the liberty interest. I gather I have a concession from Mr. McLaughlin—correct me if I am wrong, Mr. McLaughlin—that there is no liberty interest, that what you are really asserting is a property interest.

MR. McLAUGHLIN: Yes, Your Honor, I think that is the way it stands at this point.

THE COURT: So you are not asserting a liberty interest.

MR. McLAUGHLIN: Yes.

THE COURT: Fine.

T–86, T–87 and T–90. The situation the court is confronted with is that plaintiff clearly sets forth a liberty claim, but in the heat of oral argument eschewed reliance upon it. Given this circumstance, the court will construe plaintiff's claim as still urging a liberty interest.

support the proposed action." *Cleveland Board of Education v. Loudermill, et al.*, 470 U.S. 532, 545–46, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985).

Defendants argue even if Karr has a protected interest, Karr received all of the process he was due. Those protections require that the loss "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Id.* at 542, 105 S.Ct. at 1493 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950)). Defendants argue Karr received all the process which was due, that is, oral or written notice of the charges against him, an explanation of the evidence, and an opportunity to respond.

As recently discussed by the Supreme Court in *Zinermon, et al. v. Burch,* ── U.S. ──, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990), due process is "a flexible concept that varies with the particular situation." To determine what procedural protections the Constitution requires in a particular case, the court must balance several factors.

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). "Applying this test, the Court usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon*, 110 S.Ct. at 984 (citations omitted) (emphasis in original).

In some circumstances the Court has held that a statutory provision for a post-deprivation hearing, or the existence of a common-law tort remedy for erroneous deprivation, satisfies due process. *See, e.g., Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982) (" 'the necessity of quick action by the State or the impracticality of providing any predeprivation process,' " may mean that a postdeprivation remedy is constitutionally adequate. *Id.* (quoting *Parratt v. Taylor*, 451 U.S. 527, 539, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981)).

With the above principles in mind, attention is turned to the *Mathews v. Eldridge* criteria. The private interest of Karr is that he not be terminated from ongoing employment. The procedure afforded Karr under NGR 600–5 carried with it a substantial risk that he might be erroneously deprived of that employment especially where, as here, there is a factual dispute as to the basis for discharge. Additional or substitute procedural safeguards in the form of a pre-termination adversary hearing would contribute significantly to avoidance of erroneous deprivation of employment, especially where there is no provision for a post-deprivation hearing. Finally, the fiscal and administrative burden that a pre-termination adversary hearing would entail is relatively minimal. In fact, as I understand it, such a hearing is prescribed by army regulations for regular army personnel. Surely, the interest of the military in maintaining the "discipline and duty" inherent to an efficiently functioning military would be better served by military adversary pre-termination hearings than by district court post-termination remedies. The court concludes under the balancing test as set forth in *Mathews v. Eldridge*, that the deprivation was not occasioned by "random and unauthorized departures from otherwise unimpugned and established state procedures," but rather that the separation procedures promulgated by DEARNG are inadequate in the failure to afford an opportunity for an adversary pre-deprivation hearing where the facts are contested. It follows that portions of NGR 600–5(d) are facially invalid because of the failure to provide an adversary pre-termination hearing in cases of involuntary separation.

### E. *Substantive Due Process*

■ Plaintiff further alleges a violation of substantive due process which arises from his discharge. Defendants assert in their summary judgment motion that Karr's substantive due process claim fails in that Karr was separated for his lack of judgment by reason of his not timely advising his supervisor, Cochran, that Karr's subordinate tested positive for marijuana. Defendants maintain that this failure sufficed to merit separation and that Karr's allegations with respect to his discharge cannot support a cause for relief. Defendants argue that plaintiff is unable to prove that he was a victim of Cochran's alleged racial animus toward Whitney and, therefore, cannot establish a discriminatory basis for the discharge.

Karr must meet both evidentiary and legal requirements to assert a cognizable challenge to defendants termination decision. First, he must marshal sufficient evidence to indicate that his problems were in some way related to the Whitney or McDermott events. Second, he must identify a cause of action capable of affording relief.

The Third Circuit appellate court's test for examining an employee's claim of retaliation for engaging in protected activity is set forth in *Trotman v. Board of Trustees of Lincoln University*, 635 F.2d 216, 224–25 (3d Cir.1980), *cert. denied*, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981), which provides:

First, the plaintiff must show that s/he engaged in protected activity. *See Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In that case the Court stated that 'the interests of the [employee] as a citizen, in commenting upon matters of public concern' must be balanced against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees,' *id.* at 568, 88 S.Ct. at 1734–1735, and held that comment on matters of legitimate public concern by public school teachers is ordinarily protected activity. Second, a claimant who demonstrates that the activity was protected must then show that the activity was a substantial or motivating factor in a decision or action taken against the claimant. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Third, the defendant can still defeat plaintiff's claim by demonstrating that the same action would have been taken even in the absence of the protected conduct. *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 416–17, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979); *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. at 287, 97 S.Ct. at 576.

*Trotman v. Board of Trustees of Lincoln University*, 635 F.2d at 224–25.

Recent decisions of the Supreme Court and this Circuit have diminished the scope of the right to substantive due process. In *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), the Court pointed out that the guarantee of due process has historically been applied to deliberate decisions of government officials and noted that the clause was "intended to secure the individual from the arbitrary exercise of the powers of government." *Id.* at 331, 106 S.Ct. at 665.

In *Bello v. Walker*, 840 F.2d 1124 (3d Cir.), *cert. denied*, 488 U.S. 851, 109 S.Ct. 134, 102 L.Ed.2d 107 (1988), the Third Circuit appellate court set forth the factors relevant to a plaintiff's claim of a denial of substantive due process. The court stated that "the deliberate and arbitrary abuse of government power violates an individual's right to substantive due process[,]" and that relief may be appropriate where governmental action is "arbitrary, irrational, or tainted by improper motive." *Id.* at 1129 (finding evidence of substantive due process claim sufficient to maintain section 1983 cause of action). The *Bello* court found that the plaintiffs would be entitled to relief if they proved their contentions that certain municipal council members, acting in their capacity as officers of the municipality, had improperly interfered with the process by which the municipality

issued building permits, and that they had done so for partisan, political or personal reasons unrelated to the merits of the application for the permits.

Likewise in the instant case, Karr must demonstrate that retaliation for the alleged incidents was a "substantial" or "motivating factor" in defendants' decision. Karr has submitted evidence of statements and events that coincide with the activities regarding McDermott to suggest that his treatment related to his failure to obtain incriminating statements from McDermott. Further, Lank's statements in his deposition indicate that the McDermott incident made General Trivits' recommendation firm towards elimination. The direct implication of Trivits in the incident with McDermott and the "firming up" of Trivits' recommendation to Lank shortly thereafter would allow a reasonable jury to infer that plaintiff's discharge was in retaliation for the failure of plaintiff to obtain the statement from McDermott. If plaintiff can prove his allegation of retaliatory intent, he may prevail on the substantive due process claim. *See generally Neiderhiser v. Borough of Berwick*, 840 F.2d 213, 218 (3d Cir.), *cert. denied*, 488 U.S. 822, 109 S.Ct. 67, 102 L.Ed.2d 44 (1988) (If the "exemption was denied for no reason other than that it possessed a certain type of movie for rent or resale ..., [then plaintiff] plainly states a cause of action based on a violation of due process, since a denial based on nothing other than the subject matter of the films it distributed would be arbitrary or irrational."). Consequently, the court concludes that on the record plaintiff has established a claim for substantive due process so as to permit him to go forward on his substantive due process claim.

In the third step, defendants contend that the failure to inform Cochran of the positive drug test provides sufficient basis to discharge Karr such that even if plaintiff proves the allegations of retaliatory intent, plaintiff cannot establish that retaliation was the motivating factor behind the discharge. Although the military is given wide latitude to deal with personnel problems because of the peculiar demands of "discipline and duty" inherent in an effi-ciently functioning military, *Parker v. Levy*, 417 U.S. 733, 744, 94 S.Ct. 2547, 2556, 41 L.Ed.2d 439 (1974), plaintiff challenges the decision to separate with no past record of unsatisfactory performance or discipline. Although the record indicates that Karr's OER were generally good, but for communication skills and exercise of judgment, defendants have pointed to incidents of poor judgment which might provide an adequate basis to establish a record of accumulated substandard performance which would warrant discharge. The court cannot weigh the evidence when deciding a motion for summary judgment. Any inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing summary judgment. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

Although defendants allege that the discharge resulted from the concealment of the positive test result and that plaintiff's record of poor performance dictated such a harsh result in a time when retention and recruitment are major concerns of the armed forces, this is an issue of fact for the jury to decide. In this case, Karr has put into the summary judgment record sufficient facts from which a jury could conclude that Lank discharged Karr in response to the McDermott incident and the resultant firmness of Trivits' recommendation. Defendants' motion for summary judgment will be denied as to plaintiff's substantive due process claim.

In the alternative, plaintiff alleges a substantive due process claim stemming from his protection of a black subordinate soldier, Staff Sergeant Whitney, from the racial animus of Cochran. Plaintiff contends that the basis for Cochran's recommendation for removal was not the concealment of the positive marijuana test results, but rather an extension of the racial animus evidenced by Cochran.

Defendants maintain that the record indicates that racial discrimination played no part in Cochran's decision to recommend that Karr be separated from his AGR tour. Defendants argue that as a result, Karr cannot establish that he was required to protect Whitney from Cochran's racial animus and that but for those activities, Cochran would not have recommended separation such that plaintiff cannot maintain a substantive due process action based on those alleged activities. *See Trotman v. Board of Trustees of Lincoln University*, 635 F.2d at 225.

The record indicates that Cochran's reaction upon learning of the concealment of the drug test results was swift and responsive. Cochran's immediate reaction when he learned of the concealed drug test results was a recommendation that plaintiff be terminated. Cochran's reaction and the timing of that reaction can only allow one interpretation: that the recommendation was based solely on plaintiff's failure to report the positive drug test. There is no evidence in the summary judgment record that Cochran's or for that matter Lank's actions were based upon racial prejudice. Without evidence that racial discrimination was a substantial or motivating factor in Cochran's decision to recommend separation and in General Lank's acceptance of that recommendation, the court concludes that plaintiff's claims based on Cochran's racial animus must fail.

### F. *Civil Rights Claims*

■ Plaintiff asserts that the deprivations of procedural and substantive due process as guaranteed by the fourteenth amendment, *supra* at pp. 1239–45, entitle him to monetary relief under 42 U.S.C. § 1983. Plaintiff also seeks damages under 42 U.S.C. §§ 1985 and 1986 for an alleged conspiracy among defendants to deprive plaintiff of such privileges and the failure of those with knowledge of such wrongs to prevent the commission of that deprivation.

In the instant case, the court finds that plaintiffs have established procedural and substantive violations sufficient to maintain the section 1983 cause of action. In addition, the court finds that the small number of defendants coupled with the frequent interactions between group members, would allow a reasonable trier of fact to conclude that a conspiracy to deprive plaintiff of an impartial hearing in furtherance of said conspiracy did deprive plaintiff of his right to due process.

*Jorden v. National Guard Bureau*, 799 F.2d 99 (3d Cir.1986), held damage actions are barred "by military personnel against superior officers for constitutional violations," *id.* at 108, but that claims for reinstatement survive. It follows plaintiff's claims based upon 42 U.S.C. §§ 1983, 1985 and 1986 for money damages are barred. "Having determined that defendants are immune from a damage action under § 1983, we cannot see any basis for holding them susceptible to suit under §§ 1985 and 1986." *Id.* at 108, n. 12. Defendants' motion to dismiss the claims for money damages against all defendants will be granted, but will be denied as to plaintiff's claim for reinstatement.

### G. *Section 1983 as to Defendant Castle*

■ Defendants also urge that plaintiff is unable to maintain his section 1983 cause of action as to defendant Castle because plaintiff is unable to demonstrate that through his direct participation, Governor Castle caused the deprivation. *See Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Bracey v. Grenoble*, 494 F.2d 566 (3d Cir.1974).

Plaintiff argues that although Castle did not directly participate in the deprivation, to the extent the Governor can delegate his authority to a staff member, Castle is bound by the staff member's actions. Plaintiff contends that Castle, in the position of military commander-in-chief, is a defendant in this action through the actions undertaken on his behalf by those to which he delegated his authority.

Although neither argument was fully developed, the court finds that on the summary judgment record the involvement of Governor Castle, as commander-in-chief of

DEARNG, is sufficient to establish a prima facie case under section 1983. While the claim for money damages against Castle is barred, plaintiff's claim for reinstatement survives. Accordingly, Castle will not be dismissed as a party defendant.

### H. *Damages*

■ As previously stated, plaintiff is seeking, among other things, declaratory and injunctive relief in the form of reinstatement, as well as damages for his allegedly unlawful discharge from the AGR program and back pay for the period discharged. Defendants contend that even if the court finds that plaintiff was deprived of his procedural and substantive due process, the State of Delaware's eleventh amendment[9] immunity bars an award of retroactive back pay or damages. Further, defendants assert that the doctrines of official and military immunity bar an action for damages in claims arising out of military service against individual superior officers in their individual capacities.

"The state's eleventh amendment immunity extends to the Department of Military Affairs ... because [it is] an arm of the state." *Helfrich v. Com. of PA., Dept. of Military Affairs*, 660 F.2d 88, 90 (3d Cir. 1981). "[A]n award of *retroactive* monetary damages or back pay against the officials in their *official* capacity is barred because it necessarily would be paid from the state treasury." *Id.* (citing *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Skehan v. Board of Trustees*, 590 F.2d 470, 485–91 (3d Cir. 1978), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979); *West v. Keve*, 571 F.2d 158, 163 (3d Cir.1978)). *But see Paskert v. United States*, 20 Cl.Ct. 65 (1990) (The Claims Court stated that the courts

jurisdiction is premised on the fact that "an illegal separation is a legal novelty which is void and that an unlawfully separated employee continues to accrue entitlements to pay and emoluments of the position from which he was separated." *Paskert*, 20 Cl.Ct. at 77 (citing *United States v. Testan*, 424 U.S. 392, 402, 96 S.Ct. 948, 955, 47 L.Ed.2d 114 (1976) (citing *United States v. Wickersham*, 201 U.S. 390, 26 S.Ct. 469, 50 L.Ed. 798 (1906)))).

The court is aware that 20 Del.C. § 178(a) waives civil and criminal liability for the National Guard in cases of "wilful misconduct, gross negligence or bad faith." However, such action is limited to death or injury to persons or damage to property as a result of such conduct. The violations alleged by plaintiff are not the type of tortious activity to which this waiver of immunity applies. The court concludes that Delaware has not waived its eleventh amendment immunity under section 178(a).

■ In defining the boundaries of qualified immunity, the Supreme Court has recognized that "permitting damage suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). In cases where the officials are military officers, special factors exist that counsel hesitation in awarding damages against military officers.[10] *See United States v. Stanley*, 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1986).

In *Stanley*, the Supreme Court stated that:

---

**9.** The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens or Subjects of any Foreign State.

While the Amendment by its terms does not bar suits against a state by its own citizens, the Supreme Court has consistently held that an unconsenting state is immune from suits brought in federal courts by her own citizens as well as by citizens of another state. *Edelman v.*

*Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974).

**10.** Defendants assert an official immunity bar to plaintiff's request for monetary damages. However, insofar as the court has determined that defendants were acting in a military capacity, the official immunity afforded is further defined as "military immunity." The extent to which personnel in the military are shielded from liability is defined in those decisions.

What is distinctive here is the specificity of that technically superfluous grant of power, and the insistence ... with which the Constitution confers authority over the Army, Navy, and militia upon the political branches. All this counsels hesitation in our creation of damages remedies in this field.

*Id.* at 682, 107 S.Ct. at 3063. In addition, the Court applied the "special factors" analysis of *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), which depends upon the degree to which particular suits would call into question military discipline and decision making and would require judicial inquiry into and intrusion upon military matters.

Similarly, the ability of servicemen to recover damages against military officers in a military context is precluded by the Supreme Court's analysis in *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and its extension in *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), the combination of which effectively prohibit damage claims against military officers. In those cases, the logic precluding damage actions against military officials stemmed from decisions concerning damages against government officials in general. *See Jorden v. National Guard Bureau,* 799 F.2d 99, 103–8 (3d Cir.1986).

The recent decision in *Murphy v. Garrett,* 729 F.Supp. 461 (W.D.Pa 1990), clearly recites the Third Circuit case law with respect to relief from the military stating that:

Our Court of Appeals has held that federal courts have jurisdiction to consider 'suits for injunctive relief against the military.' *Jorden v. National Guard Bureau,* 799 F.2d 99, 109 (3d Cir.1986), *cert. denied,* 484 U.S. 815, 108 S.Ct. 66, 98 L.Ed.2d 30 (1987). *See also, Dillard v. Brown,* 652 F.2d 316 (3d Cir.1981). The Supreme Court has cited injunctive actions as indicative of the type of relief service members may seek in the civilian courts. *See, e.g., Chappell v. Wallace,* 462 U.S. 296, 304–05, 103 S.Ct. 2362,

2367–2368, 76 L.Ed.2d 586 (1983) [ (citations omitted) ]....

To the extent that [plaintiff] seeks damages from the military, however, we may not entertain such a suit. *Jorden,* 799 F.2d at 108 (reading *Chappell* as "laying down a general rule barring damages actions by military personnel against superior officers for constitutional violations")....

*Id.* at 467. The "majority of circuits that have considered the question[ ] has extended the logic of *Chappell* to actions brought against National Guard Officers under § 1983." *Watson v. Arkansas Nat. Guard,* 886 F.2d 1004 (8th Cir.1989).

Plaintiff argues that the doctrine of intramilitary immunity should not be afforded to individual defendants, excepting Governor Castle, in that they were not acting in an authentic military capacity. Plaintiff argues the individual defendants performed in a civilian capacity and that the total disregard for authentic military characteristics further questions whether any of the individual defendants were situated in a military capacity.

As previously rehearsed, plaintiff's argument that the individual officers were acting in a civilian capacity and not in an authentic military capacity has no case support. Further, the special nature of the military would counsel the court to deny extending a cause of action in this case. Congressionally uninvited judicial intrusion into military affairs is generally inappropriate, *United States v. Stanley,* 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987), and thus labelling an officers decision, where that officer serves in a dual civilian and military capacity, as civilian rather than military would clearly be inappropriate where that decision implicates military affairs.

The court finds that decisions regarding discipline and discharge, as in this case, impact the nature of military service. It follows that damages against superior officers for constitutional violations arising in that context are barred by the doctrine of military immunity. Thus, although the case law does not preclude liability for all

damage actions against military officials, this is not one of those cases. Similarly, plaintiff's state law claims seek monetary damages. Because money damages are not recoverable against the defendants, the state law claims will also be dismissed. *Jorden v. National Guard Bureau,* 799 F.2d at 108 n. 12.

In summary, the court concludes that plaintiff's only redress is for reinstatement. Such injunctive relief is maintainable under either 42 U.S.C. § 1983 or the Constitution. *See id.* at 111 n. 17.

### I. *False Claims Act*

 Plaintiff seeks damages under the False Claims Act, 31 U.S.C. § 3729, for the alleged use of federal funds for state interests. Specifically, plaintiff alleges that DEARNG used the AGR full-time recruiting force in support of a state mission to control the prisons during a Department of Corrections strike and in support of a First Army Conference.

In both of those incidents, plaintiff maintains that defendants knowingly misused AGR personnel which are funded by the United States solely for the purpose of recruitment. Section 3729 provides for damages from a defendant that "knowingly presents, or causes to be presented to an officer or employee of the Government or a member of an armed force a false or fraudulent claim for payment or approval...." Section 3730 provides a civil action for violation of section 3729, as long as that person was acting in good faith and safeguarding the government's interests. However, plaintiff concedes that if the court determines the DEARNG officials were acting in a military capacity, liability is precluded by the immunity section of 3730. Plaintiff argues that defendants were acting in their civilian capacity rather than military capacity when directing the alleged acts, which gave rise to his false claims action. There is a three-fold answer. First, there is no case support for the novel proposition that liability is dependent upon the status of defendants when they acted.

Second, defendants were acting in a military capacity in that the conference supported the proper functioning of DEARNG. The court finds that in both incidents the DEARNG personnel were acting in an official military capacity.

Finally, 31 U.S.C. § 3730(e) bars a cause of action based on the False Claims Act. The statute provides:

> (e) Certain Actions Barred.—(1) No court shall have jurisdiction over an action brought by a former or present member of the armed forces under subsection (b) of this section against a member of the armed forces arising out of such person's service in the armed forces....

The statutory language is an unequivocal bar. The scant legislative history of section 3730(e)(1) reinforces there is no other possible construction:

> Subsection (e)(1) of section 3730 prohibits *qui tam* actions among members of the armed servies [sic] where such actions arise out of any such persons' service in the armed forces. This provision only prohibits servicemen and women from suing each other under the False Claims Act and in no way exempts them from liability under the act if the government brings an action against them.

False Claims Amendments Act of 1986, Pub.L. 99–562.

Plaintiff's cause of action based upon the False Claims Act is barred. Summary judgment will be entered against plaintiff on his action predicated upon the False Claims Act.

### III. CONCLUSION

Both summary judgment motions will be granted in part and denied in part. The court has concluded that the DEARNG regulations are not governed by the federal military regulations by reason of federal military authorization or the Delaware Code. Further, issues of material fact preclude a determination as to whether the DEARNG regulations were properly applied; however, even proper application of those procedures is unconstitutional in that those regulations are facially invalid as an

 

abrogation of procedural due process by reason of the failure to afford a pre-termination hearing.

The court has found issues of material fact preclude a determination on the claim of substantive due process based on the alleged consideration by Lank of additional incidents to which plaintiff was not afforded an opportunity to respond. On the other hand, the court has concluded that plaintiff has failed to establish a substantive due process claim based on Cochran's alleged racial animus and that claim will be dismissed.

The court concludes that the constitutional deprivations are sufficient to establish a claim under 42 U.S.C. §§ 1983, 1985 and 1986. However, the State of Delaware's immunity under the eleventh amendment, *Jorden* (which incorporates military immunity), and the doctrine of military immunity precludes an award of back pay or damages against the individual defendants in their official and individual capacities. Thus, the only relief to which plaintiff is entitled is reinstatement and such that plaintiff's 42 U.S.C. §§ 1985 and 1986 and state law claims are dismissed.

Finally, the court concludes that the cause of action under the False Claims Act is barred by 31 U.S.C. § 3730(e)(1).

Consequently, the unconstitutionality of the regulations based on the failure to provide procedural safeguards for the implicated liberty interest affords plaintiff the only relief to which he is entitled, namely reinstatement. Although issues of material fact preclude resolution of the propriety of the specific procedures applied in this case and the alleged substantive due process violations, those causes of action would not afford plaintiff further redress. Therefore, the court will order reinstatement and dismiss all other claims.

The court is aware that its holding with respect to facial invalidity of the NGR 600–5(d) combined with its holding on damages results in much of what has been said being relegated to mere dicta. However, given the novelty of many of the issues, it is hoped that by memorializing its thoughts a remand for further factual findings or

analysis will be avoided in the event there is an appeal.

An order on notice to defendants reflecting the above holdings shall be submitted by the plaintiff on or before September 21, 1990. If defendants disagree with plaintiff's form of proposed order, they shall submit on notice their own form of order on or before September 28, 1990.