Jon T. KARR, Plaintiff,

v.

The Honorable Thomas R. CARPER, Governor of Delaware; Brigadier Major General Arthur Episcopo, The Adjutant General of Delaware, ex officio; the Department of Military Affairs, and the State of Delaware, Defendants,

and

United States of America, Intervening Defendant.

Civ. A. No. 88–466 MMS.

United States District Court, D. Delaware.

March 31, 1993.

John S. Malik, Wilmington, DE, for plaintiff.

John J. Polk, Deputy Atty. Gen., Department of Justice, Wilmington, DE, for defendants.

William C. Carpenter, Jr., U.S. Atty., Dept. of Justice, Wilmington, DE, Stuart M. Gerson, Asst. Atty. Gen., Vincent M. Garvey, and Lisa A. Olson, Dept. of Justice, Civil Div., Washington, DC; Of Counsel: Jill M. Grant, Captain, U.S. Army, for intervening defendant U.S.

### OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

### INTRODUCTION

Plaintiff, Jon T. Karr ["Karr"], brought suit against defendants Governor Michael N. Castle, Major General Arthur Episcopo, the Department of Military Affairs and the State of Delaware alleging illegalities in his separation from Active Guard/Reserve status of the National Guard. The issues were significantly narrowed prior to trial. *See Karr v. Castle,* 768 F.Supp. 1087 (D.Del.1991) (motions for reconsideration and motion to intervene); *United States ex rel. Karr v. Castle,* No. 88–466 (D.Del. Dec. 14, 1990) (Memorandum Opinion implementing prior opinion); *United States ex rel. Karr v. Castle,* 746 F.Supp. 1231 (D.Del.1990) (cross motions for summary judgment). The only issue remaining for a bench trial was whether Karr's separation was accomplished in compliance with National Guard Regulation ["NGR"] 600-5. After a trial on the issue, this Court finds Karr's failure to exhaust his administrative remedies [1] does not prevent the Court from considering Karr's claim and that Karr's separation violated NGR 600-5. It will therefore be ordered that Karr be given a new separation determination following the procedural requirements of NGR 600-5.

### DISCUSSION

#### A. Exhaustion

As a preliminary matter defendants contend that it is inappropriate for the Court to render an opinion on the merits of this case because plaintiff has failed to exhaust his administrative remedies. Specifically, defendants assert plaintiff should have sought review of his separation from the Army Board for Correction of Military Records ["ABCMR"].

The Third Circuit Court of Appeals has not adopted a *per se* exhaustion requirement for military personnel seeking redress in federal court. *Jorden v. National Guard Bureau,* 799 F.2d 99, 102 n. 5 (3d Cir.1986), *cert. denied sub nom. Sajer v. Jorden,* 484 U.S. 815, 108 S.Ct. 66, 98 L.Ed.2d 30 (1987). That court has opted instead for an approach which focuses on the adequacy of the remedy the administrative process could potentially supply. *Id.* In *Jorden,* plaintiff had been separated from the Pennsylvania Air Nation-

---

1. The failure to exhaust administrative remedies    was urged by defendants in post-trial briefing.

al Guard ["PaANG"]. He brought suit in federal court seeking both money damages and reinstatement to his military and civilian positions in the PaANG. The trial court had determined Jorden's failure to exhaust administrative remedies warranted dismissal of his suit. The appellate court disagreed holding that the available administrative remedy could not provide satisfactory relief. Its decision was based, *inter alia,* on the court's finding that the Air Force Board for the Correction of Military Records, as a federal board, lacked the ability to order Jorden's reinstatement to the National Guard, a state entity.[2]

The instant case presents a similar situation and seemingly warrants the same result. Karr, as Jorden, was a member of a state National Guard. Defendants here, as in Jorden, contend plaintiff's claim should not be heard until he has exhausted his administrative remedies by first seeking review from a federal board for the correction of military records. Defendants in the instant case seek to distinguish *Jorden* by pointing out that plaintiff there had been separated from and sought reinstatement to the state National Guard while Karr was separated only from the AGR program, not the state National Guard. While defendants' assertion is correct, the distinction is not meaningful. The reason Jorden's remedy was found inadequate was because the federal board there could not grant the relief necessary to redress Jorden's grievance. The situation in the present case is the same. The potential remedy here is an order directing Delaware State National Guard personnel to reevaluate Karr's separation in conformance with NGR 600–5. The ABCMR, as a federal board does not posses the power to issue such an order.

■ The powers of the ABCMR are set forth in 10 U.S.C. § 1552 (1988 & Supp. III 1991), which specifies in pertinent part:

(a)(1) The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice. Except as provided in paragraph (2), such corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department....

(c) The Secretary concerned may pay, from applicable current appropriations, a claim for the loss of pay, allowances, compensation, emoluments, or other pecuniary benefits, or for the repayment of a fine or forfeiture, if as a result of correcting a record under this section, the amount is found to be due the claimant on account of his or another's service in the Army, Navy, Air Force, Marine Corps, or Coast Guard, as the case may be....

10 U.S.C. § 1552 (1988 & Supp. III 1991). Thus, for those National Guard personnel who are also members of ARNGUS or ANGUS, the ABCMR can order reinstatement to a federal reserve status similar to state status, restore pay and order backpay. *Williams v. Wilson,* 762 F.2d 357, 360 n. 2 (4th Cir.1985); *Penagaricano v. Llenza,* 747 F.2d 55, 57 (1st Cir.1984). However, numerous courts have found, albeit in the context of reinstatement to a state National Guard, that the power of federal boards such as the ABCMR or the Air Force Board for Correction of Military Records is limited by section 1552 so that such boards do not have the authority to provide remedies that consist of directives to state National Guard bodies. *See, Jorden,* 799 F.2d at 102 n. 5; *Navas v. Vales,* 752 F.2d 765, 770 (1st Cir.1985); *Williams,* 762 F.2d at 360 n. 6; *Penagaricano,* 747 F.2d at 57.

■ The present case concerns the possible remedy of ordering reevaluation of Karr's separation from his AGR tour.[3] As this

---

2. The court's ruling highlights the dual nature of the National Guard system. The National Guard is a component of the militia of the various states. Members of such state systems may also become members of the Army or Air National Guard of the United States ["ARNGUS" or "ANGUS"]. A federal board for the correction of military records has the authority to correct federal aspects of a Guard member's military records.

3. The Court takes no position on the appropriate remedy to be afforded Karr if after consideration of whether Karr should be separated in accordance with the procedures of NGR 600–5 the Adjutant General of the National Guard determines Karr should not have been separated.

Court has already found, Karr in his role as AGR member was under state, not federal control. *Karr v. Castle,* 746 F.Supp. 1231, 1237 (D.Del.1990). Karr obtained his AGR status by action of Delaware State National Guard personnel, Docket Item 109 ["D.I. 109"] Exhibit B ["Ex.–B"]. Furthermore, it was the State Adjutant General who had the final authority to separate Karr from his AGR tour. *See* NGR 600–5 § 6–1(f). Thus, it would be state personnel who would potentially be ordered to have a fresh look at his separation. Section 1552 does not list among the ABCMR's powers the ability to order the state National Guard to reconsider its separation of Guard members from AGR status. Just as the ABCMR does not possess the authority to order state personnel to reinstate a separated National Guard member to membership in that state organization, it lacks the power to order state personnel to consider anew termination of a Guard member's state authorized AGR status.

Defendants cite *Thomas v. Cheney,* 925 F.2d 1407 (Fed.Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 93, 116 L.Ed.2d 65 (1991), and *Lovell v. Heng,* 890 F.2d 63 (8th Cir. 1989), for the proposition that the ABCMR "may also entertain claims concerning the separation of guard personnel from AGR tours." D.I. 129 at 14. This Court reads those cases differently. Defendants cite the following language as the holding of *Lovell:* "dismissing such a claim [one concerning separation from an AGR tour] without prejudice to review by the Army Board for Correction of Military Records." This statement by the *Lovell* court merely indicates that although plaintiff's claim was non-justiciable at that point, the court's dismissal should not be seen as precluding review of any future decision the ABCMR might make in plaintiff's case. It does not stand for the proposition, central to the present case, that the ABCMR may provide relief involving state National Guard bodies.

Similarly in *Thomas* the dual nature of AGR status causes confusion. It appears that although plaintiff was an AGR member, the entire controversy there was over *federal* issues: the determination by the Army that

plaintiff was AWOL; the Army's decision to drop plaintiff from the rolls of the Army; and the Army's designation of plaintiff as a deserter. Nothing indicates this case had anything to do with any state National Guard, nor is any state National Guard named as a defendant. Thus, defendants' argument that the ABCMR may sometimes consider matters relating to AGR tours adds nothing to the analysis where plaintiff seeks a remedy involving a state National Guard body.

Under the approach laid down in *Jorden,* the ABCMR's inability to order the Delaware State National Guard to take a fresh look at Karr's separation from his AGR tour of duty renders the remedy available to Karr via the administrative process unsatisfactory. It follows that Karr's failure to exhaust his administrative remedies by petitioning the ABCMR does not impinge upon this Court's obligation to render a decision following trial.

**B. Violation of NGR 600–5 § 6–5d**

■ Having determined plaintiff's failure to exhaust administrative remedies does not prevent this Court from deciding Karr's claim, the Court next turns to consideration of whether Karr's separation complied with National Guard Regulation ["NGR"] 600–5 § 6–5d. That regulation provides in pertinent part:

(1) A commander at any echelon may submit a recommendation to involuntarily separate an AGR member, who is assigned within that organization, from the AGR program through channels to the State Adjutant General for a final determination. The following procedures will be followed for separation under this paragraph.

(a) The unit commander will refer the recommendation to the AGR member concerned for rebuttal or comment prior to forwarding through command channels.

(b) Specific reasons for the release must be presented in writing to the AGR member. Comments offered by AGR member will be included with the initiating commander's recommendations....

(c) ARNG intermediate commanders will recommend approval/disapproval, indicating the reason(s), and forward to next

higher headquarters with the least practicable delay. If additional reasons for separation are included in the initiating commander's recommendation, the AGR member will be given the opportunity to rebut those additional reasons.

. . . . .

(e) AGR member will not be released from full-time National Guard duty until the State Adjutant General has approved final involuntary separation.

NGR 600–5 § 6–5d. This regulation insures a State Adjutant General's decision to separate an AGR member is an informed one by requiring that the record on which an Adjutant General bases his or her determination to separate is one developed by both the AGR member and his or her commanding officers.

Plaintiff does not dispute that subsections (a) and (b) were followed. Colonel Cochran initiated the request to separate Karr from the AGR tour. Trial transcript at p. 159 ["Tr.–159"]. Cochran notified Karr of his recommendation Karr be separated by written memorandum dated October 1, 1987. Tr.–140. The memorandum set forth Cochran's reasons for seeking Karr's separation and notified Karr that he had ten days in which to rebut any of the reasons cited. It informed Karr that the recommendation and any rebuttal would be forwarded to General Trivits and ultimately to then Adjutant General Lank with whom final approval for separation rested. Plaintiff's Exhibit 1 ["PX–1"]. Karr responded to Cochran's recommendation in writing on October 15, 1987. Tr.–141; PX–2. As an intermediate commander Assistant Adjutant General Trivits indicated his approval of the proposed separation of Karr setting forth his reasons in a memorandum dated October 27, 1987. Defendants' Exhibit 1 ["DX–1"]. Cochran's recommendation, General Trivits recommendation, and Karr's rebuttal memorandum were received by then Adjutant General Lank for his consideration. Tr.–38–42.

The area of disagreement between the parties is with respect to the requirement of NGR 600–5 § 6–5d(1)(c) that, "[i]f additional reasons for separation are included in the initiating commander's recommendation, the AGR member ... be given the opportunity to rebut those additional reasons." The disagreement focusses on an incident that occurred subsequent to the previously outlined events which caused Cochran to issue a memorandum of reprimand on December 1, 1987. Plaintiff's argument is that if Lank based his determination to separate Karr on this subsequent incident, section 6–5d(1)(c) was violated since Karr was given no opportunity to rebut these "additional reasons." The Court must, therefore, determine whether Lank considered the additional reasons in deciding to separate Karr and, if so, whether Karr was given the opportunity to rebut those reasons.

**1. Whether Lank Considered "Additional Reasons"**

Determination of whether Lank considered "additional reasons" depends first on whether Lank was informed of any such reasons and second whether he actually considered them in reaching the decision to separate Karr. The Court, having had the opportunity to observe and gauge the demeanor of Lank, concludes Lank both knew of and considered "additional reasons" in deciding to separate Karr.

The incident giving rise to these possible "additional reasons" occurred during November of 1987. The event has been loosely referred to by the parties as the "McDermott" incident. The facts of the incident itself are not particularly relevant to the present proceeding. Suffice it to say Karr allegedly failed to question Major McDermott about allegations she had made concerning General Trivits. Apparently, Karr chose instead to read McDermott a "Miranda" warning so that she refused to answer any questions, and then transport McDermott to Lank's house so that she could discuss the situation with Lank. Tr.–27–30; PX–3. The issue, therefore, is whether Lank knew of this "additional reason" for separation, i.e., the "McDermott incident."

The incident prompted Cochran to prepare a memorandum of reprimand on December 1, 1987. PX–3. At trial Lank first testified that he could not remember whether or not he had seen a copy of the memorandum prior

to separating Karr. Tr.–51–53; Tr.–96.[4] After repeated questioning by counsel for defendants at trial, General Lank refused to affirmatively state that he had not seen the memorandum prior to his decision to separate Karr. The Court finds it more likely than not that Lank did see the memorandum. But, even if Lank did not know of the existence of the actual December 1, 1987 memorandum, this Court finds he was well aware of its contents, i.e., the McDermott incident.

First, Lank admitted at trial that prior to separating Karr he knew of the McDermott incident, at least from his own personal involvement in the evening's events. Tr.–54; Tr.–55. Second, it appears that the close personal relationship among Lank, Trivits and Cochran as well as their close geographic proximity to each other created a situation in which information about the incident must have been shared by the three commanders. The Headquarters is housed in a building that had been a small elementary school. All three commanders had offices in the building. Trivits had the office next door to Lank's and Cochran's office was directly across the hall. Tr.–130–31. Lank testified that all three were in close communication. Tr.–131. The commanders at times ate lunch together. Tr.–158–59. Lank admitted that given the closeness of the commanders he must have known of Cochran's December 1, 1987 reprimand of Karr. Tr.–129.

Third, Lank's testimony reveals both Cochran and Trivits communicated with Lank regarding the McDermott incident prior to Lank's decision to separate Karr. Lank admitted having conversations with Cochran regarding the McDermott incident. Tr.–129. At trial Lank also admitted speaking to Trivits after the McDermott incident and prior to his decision to separate Karr. However, he disavowed receiving any input from Trivits concerning the McDermott incident as a reason for Karr's separation. Tr.–55–58. This disavowal is contradicted by Lank's deposition testimony. At his deposition Lank testified that in the period from October 27 to December 8, 1987 he and Trivits had discussions regarding the recommendation to separate Karr. Lank testified that during this time Trivits' view as to the proper resolution of Karr's status changed. Trivits' recommendation to Lank became an emphatic recommendation for separation as a result of Karr's further apparent misconduct in the form of the McDermott incident. *United States ex rel. Karr v. Castle,* 746 F.Supp. 1231, 1235 (D.Del.1990). *See also* Tr.–116–117. This Court has had ample opportunity to observe the demeanor of the witnesses during the course of trial and while the Court does not believe Lank would intentionally mislead the Court, it finds Lank's unequivocal deposition testimony more compelling than his trial testimony.

The Court finds General Lank was indeed presented with "additional reasons" for the separation of Karr prior to Lank's December 8, 1987 decision to separate. The Court must next determine whether Lank's decision to separate Karr was in any way based on the McDermott incident.

Conflict and imprecision surrounds this issue. Karr asserts Lank relied on the McDermott incident in deciding to separate him. Lank denies any such reliance. The issue, therefore, comes down to one of the credibility of the witnesses and analysis of their testimony. After careful observation of the witnesses and analysis of their statements, the Court is persuaded Lank's decision to separate Karr was based, at least in part, on the McDermott incident.

Karr's testimony indicates Lank had considered the McDermott incident in arriving at the decision to separate Karr. Karr stated that at the meeting at which Lank separated him, Lank was apprised of the McDermott incident, that Lank affirmatively stated the incident constituted another example of Karr's poor judgment and that Lank's consideration of the incident played a role in Lank's decision to separate. Karr testified,

A. ... He made it clear to me at that time that that was the final straw, that while he had been weighing these earlier allegations of October 1st and had not yet

---

4. Defendants point out that the memo itself does not indicate Lank was to receive a copy. PX–3; Tr.–126–27. This, however, is not conclusive as Cochran's October 1, 1987 memorandum, received by Lank, also bears no indication Lank was to receive a copy.

reached a decision on them in that weighing process, that the McDermott incident, as we have characterized it, pushed him over the edge and coalesced his decision-making process into separating me.

.        .        .        .        .

Q. Now, during the course of this conversation when you are referring to the McDermott incident, did General Lank specifically use the terminology that the McDermott incident was the, quote, "last straw," unquote?

A. Yes, sir, he did.

Q. Did he also use the terminology to the effect that the McDermott incident was, quote, "another example of poor judgment," unquote?

A. Yes, sir, he did. When he used the term "another example of poor judgment," end quote, it was evident to me there in the room at the time that it would have been fruitless to have pursued it with him. It was evident to me that his mind was made up based upon information he had received from other sources, beyond me, other than me, and that what he wanted to do was finish the discussion and exit me out. And that's what we did.

Tr.–148–50. Karr's hand written notes of the meeting also reflect Lank's decision to separate Karr was motivated by the McDermott incident. DX–3.

Defendants, on the other hand assert Lank did not consider the McDermott incident in his decision. A number of statements contained in Lank's testimony lead the Court to disagree. The first is consideration of Lank's affirmative denial of reliance on the McDermott incident in his decision-making process. Lank seemed to indicate at trial that the record on which he based his decision to separate Karr did not include Cochran's memorandum on the McDermott incident. Tr.–51–52. He also testified that the McDermott incident did not enter into his determination to separate Karr. Tr.–56–57; Tr.–111–13. However, Lank's trial testimony on this point occurred in the context of Lank's conversation with Karr during the meeting at which Lank officially separated him. At that meeting Lank brought up the subject of the McDermott incident. He told Karr that the McDermott incident was an example of Karr's use of poor judgment. Tr.–54. Lank asserted his mentioning of the incident was not an indication that it played a role in his decision to separate Karr saying instead that he brought it up merely as another example of Karr's trend in poor judgment. Tr.–56–67; Tr.–111–12. It appears, however, that this characterization understates the role the incident played in Lank's reasoning. Lank admitted that he broached the subject because the incident demonstrated that Lank "felt his [Karr's] *future* judgment was going to continue to be impaired." Tr.–112. This demonstrates that one of Lank's reasons for separating Karr, i.e., that Karr's future judgment would be impaired, was based at least in part on the McDermott incident.

This is further supported by the following questioning of Lank at trial:

Q. I understand you discussed that [the McDermott incident] with Captain Karr. But I am saying, given the fact that this was a topic of discussion with General Trivits, when you met with him prior to your decision, are you able to testify that in no way, shape or form did the McDermott incident play a role in you deciding to separate Jon Karr?

A. I don't think I could say that. You know, it happened. My fear was it was going to happen again, time after time.

Tr.–66–67. In addition, when asked if the incident entered into his decision-making process Lank repeatedly and candidly protested that he was "only human" indicating the impossibility of separating his knowledge of this latest example of poor judgment from the previous examples of poor judgment (i.e., those permissibly considered by Lank in deciding whether to terminate Karr). Tr.–53–55.

Finally, on redirect Lank was asked:

Q. So you would agree that as of your deposition in 1989, you had conceded that certainly the McDermott incident was an additional factor that was looked at in making the determination to recommend elimination?

A. Again, I will say that I am human. That is why I brought the subject up in the verbal interview with Captain Karr. It's just a shame that this sort of thing continued to happen. And if I had let it go on any longer, who knows?

Q. I take it—is that basically a yes?

A. Yeah.

Tr.–117–18.

Communications between Lank and Trivits also show the McDermott incident played a role in Karr's separation. At his deposition Lank was questioned about what action Trivits recommended with respect to Karr. Trivits' memorandum prompted by Cochran's October 1, 1987 memorandum of separation had presented alternate "sanctions" for Lank's consideration. One of these was Karr's separation, and Trivits was in favor of this sanction at the time he wrote the memorandum. DX–1. When the McDermott incident occurred subsequent to that, however, it appears Trivits' recommendation for separation became intensified. Thus, Trivits' strong recommendation that Lank separate Karr was based on the McDermott incident. Lank's deposition testimony shows he received Trivits' new, more emphatic recommendation for separation and considered it in deciding to separate Karr. *United States ex rel. Karr v. Castle,* 746 F.Supp. 1231, 1235 (D.Del.1990). *See also* Tr.–116–117. Lank did attempt to ameliorate the impact of this admission when he testified at trial by stating that he relied only on the earlier memoranda in making his decision. However, he admitted that in his later contact with Trivits, Trivits' recommendation for separation had become "emphatic" and that the McDermott incident could not have been separated from the other grounds causing Trivits' emphatic recommendation. Tr.–57–58.

The Court finds Lank both knew of and relied on "additional reasons" in deciding to separate Karr.

### 2. Whether Karr Had an Opportunity to Rebut

If Karr did not have the opportunity to rebut the "additional reasons" considered by

Lank in his decision to separate, Karr's separation was not accomplished in compliance with NGR 600–5. Therefore, the Court must now determine if Karr was given such an opportunity.

On December 5, 1987 Karr did in fact prepare a written rebuttal to Cochran's memorandum of reprimand concerning the McDermott incident. Tr.–146. He delivered this response to Cochran, Chief Warrant Officer Kenneth Rhoads and Colonel Walter Powell late in the afternoon on December 8, 1987. *Id.;* D.I. 114 at 2. Karr was summoned to Lank's office and separated from his AGR tour at approximately four o'clock that same afternoon. Tr.–147. Although testimony was less than clear, it appears that Lank did not receive Karr's rebuttal memorandum prior to separating Karr. Tr.–96–97. The parties agree Lank did not consider Karr's memorandum prior to separating him. D.I. 114 at 2.

Lank considered "additional reasons" in deciding to separate Karr. Karr was not given an opportunity to rebut such additional reasons as required by NGR 600–5. This Court, therefore, finds Karr's separation violated NGR 600–5.

### CONCLUSION

The Court finds Lank knew of and relied on "additional reasons," i.e., events termed the "McDermott incident," in deciding to separate Karr from his AGR tour. Karr was not given an opportunity to rebut these "additional reasons." Karr's separation therefore violated NGR 600–5. The remedy to which Karr is entitled is a reevaluation of the decision to separate him with such reevaluation conforming to the procedural requirements of NGR 600–5.[5] An appropriate order will issue.

---

5. At trial Karr indicated the remedy he sought was reevaluation of the separation decision and not reinstatement to an AGR tour:

THE COURT:—are you saying that the Court should not and need not as a matter of law order the reinstatement of Captain Karr?

MR. MALIK: Your Honor, that is our position. I might just refer to Captain Karr. Yes.

THE COURT: What authority do you rely upon? Mr. Polk's [attorney for defendants'] authority?

MR. MALIK: It was fairly conceded, Your Honor, based on the representations that were made and the authorities cited in the State's opening brief on the issue, that it would be impossible, in light of the federal case law, for the Court to reinstate Captain Karr.

THE COURT: So there is no case law out there going the other way.

MR. MALIK: That is our position, Your Honor, yes.

Tr.–7–8. Under these circumstances there is no occasion to treat the propriety of any other possible remedy.